# EXHIBIT A-1

**SUBLEASE BL** _____

Between

**SUN VALLEY MARINA DEVELOPMENT CORPORATION,**

**a tribal corporation chartered by the Gila River Indian Community**

**("Lessor")**

**and**

**BOB BONDURANT SCHOOL OF HIGH PERFORMANCE DRIVING, INC.,**

**an Arizona Corporation**

**("Lessee")**

# TABLE OF CONTENTS

1.  Definitions ...................................................................................................................2

2.  Demise of Leased Premises, Access Easement and Use of Carousel/Looper.. ........5

3.  Lease Term ..................................................................................................................6

4.  Uses of Leased Premises .............................................................................................6

    4.1  Lessee's Exclusive Uses ..................................................................................6

    4.2  Lessee's Non-Exclusive Uses ..........................................................................6

    4.3  Use Limitations ................................................................................................7

5.  Rent ..............................................................................................................................8

    5.1  Rent ..................................................................................................................8

    5.2  Periodic Review ...............................................................................................9

    5.3  Payment ............................................................................................................9

6.  Lessee Improvements ..................................................................................................9

    6.1  Construction Obligations .................................................................................9

    6.2  Lessee Maintenance, Repair, Alteration .......................................................10

7.  Indemnification. ........................................................................................................10

8.  Non-Responsibility Notices ......................................................................................11

9.  Performance Bond .....................................................................................................11

    9.1  Payment Bond ................................................................................................11

    9.2  Other Forms of Security .................................................................................12

    9.3  Other Bond Requirements ..............................................................................12

10.  Insurance ...................................................................................................................12

    10.1  Commercial General Liability .......................................................................12

    10.2  Business Automobile Liability ......................................................................12

    10.3  Excess Liability .............................................................................................13

i

| | | |
|---|---|---|
| 10.4 | Workers Compensation Insurance | 13 |
| 10.5 | Evidence of Insurance | 13 |
| 10.6 | Fire and Damage Insurance | 13 |
| 10.7 | Waiver of Subrogation | 14 |
| 10.8 | Insurers | 14 |
| 11. | Sublease, Assignment and Transfer. | 14 |
| 11.1 | Sublease | 14 |
| 11.2 | Assignment or Transfer | 15 |
| 11.3 | Third Party Rent | 15 |
| 12. | Status of Lease | 16 |
| 12.1 | Termination of the Master Lease | 16 |
| 12.2 | Conflicts with the Master Lease | 16 |
| 13. | Approved Encumbrance | 16 |
| 13.1 | Copies | 16 |
| 13.2 | Use of Proceeds | 16 |
| 13.3 | Reversionary Interest | 17 |
| 13.4 | Lessor Right to Cure | 17 |
| 13.5 | Consent to Cancellation or Amendment | 17 |
| 14. | Liens, Taxes, Assessments, Utility Charges | 17 |
| 14.1 | Community-owned Utilities | 17 |
| 15. | Environmental Protection Requirements | 18 |
| 15.1 | Special Definitions Related to Environmental Protection. | 18 |
| 15.2 | Historic Preservation and Archeological Resources | 18 |
| 15.3 | Hazardous Materials | 19 |
| 15.4 | Water Pollution Prevention. | 21 |

| | | |
|---|---|---|
| 15.5 | Solid Waste Disposal Storage or Industrial Liquids. | 21 |
| 15.6 | Indemnification. | 22 |
| 15.7 | Entry and Inspection | 23 |
| 15.8 | Default Under Environmental Provisions | 23 |
| 15.9 | Survival of This Section | 23 |
| 15.10 | Pre-existing Conditions | 23 |
| 15.11 | Environmental Bond | 23 |
| 16. | Eminent Domain. | 24 |
| 16.1 | Allocation of Compensation for Taking | 24 |
| 16.2 | Refund of Rent | 24 |
| 16.3 | Voluntary Conveyance a Taking | 24 |
| 16.4 | Total Taking Terminates Lease | 24 |
| 16.5 | Partial Taking | 24 |
| 17. | Default | 24 |
| 17.1 | Lessee Default | 24 |
| 17.2 | Lessor Default | 26 |
| 18. | Dispute Resolution. | 26 |
| 18.1 | Limited Waiver of Sovereign Immunity | 26 |
| 18.2 | Federal Arbitration Act in Accordance with AAA Rules | 26 |
| 18.3 | Emergency Remedies. | 27 |
| 19. | Governing Law | 28 |
| 20. | General Limitations | 28 |
| 20.1 | No Interest in Real Property | 28 |
| 20.2 | No Waiver of Lessor's and Master Lessor's Sovereign Immunity | 28 |
| 20.3 | No Consent to Jurisdiction | 28 |

Case 2:18-bk-12041-BKM    Doc 118-1    Filed 01/04/19    Entered 01/04/19 12:53:50
Desc Exhibit A-1    Page 5 of 53

21.    Employment Preference.................................................................................29

22.    Holding Over .................................................................................................29

23.    No Partnership ...............................................................................................29

24.    Termination of Federal Trust........................................................................29

25.    Lessee's Obligation to the United States .....................................................29

26.    Inspection......................................................................................................30

27.    Closure Bond; Delivery of Leased Premises ...............................................30

    27.1    Closure Bond .....................................................................................30

    27.2    Lessee's Liability ..............................................................................30

    27.3    Delivery of Leased Premises .............................................................30

28.    Lease Binding ...............................................................................................31

29.    Tax Immunity................................................................................................31

30.    Interest of Member of Congress ...................................................................31

31.    Force Majeure ...............................................................................................31

32.    Validity of Lease and Amendments..............................................................31

33.    Severability ...................................................................................................31

34.    Multiple Counterparts ...................................................................................32

35.    Confidentiality ..............................................................................................32

36.    Short Form of Lease......................................................................................32

37.    Time of the Essence .....................................................................................32

38.    Laws and Ordinances of the Community......................................................32

39.    Notices; Payments; Demands .......................................................................32

    39.1    For Lessor ..........................................................................................32

    39.2    For Master Lessor ..............................................................................33

    39.3    For Lessee ..........................................................................................33

    39.4     For Secretary ................................................................................34

    39.5     Delivery and Service.....................................................................34

40.     Waiver.............................................................................................34

41.     Requests for Records and Reports ..................................................34

42      Groundwater Use Agreement ..........................................................34

43.     Condition of Leased Premises .........................................................34

44.     Wild Horse Pass Motorsports Park Track Rental ...................................35

45.     Accounting and Audits ...................................................................35

46.     Use of Lessor's Facilities and Lands ................................................35

47.     West Track.....................................................................................35

48.     Carousel/Looper.............................................................................36

49.     Parking Rights................................................................................37

50.     Signage..........................................................................................37

# SCHEDULE OF EXHIBITS

Exhibit A – Leased Premises
Exhibit B – Parcel A
Exhibit C – West Track
Exhibit D – Access Easement
Exhibit E – Carousel/Looper
Exhibit F – Lessor's Maintenance Area
Exhibit G – Common Utilities
Exhibit H – Tracks and Associated Areas
Exhibit I – Depiction of Skid Pad
Exhibit J – Overhead Entryway Signage

**THIS SUBLEASE BL** _____ is made and entered into on March 1, 2017, by and between SUN VALLEY MARINA DEVELOPMENT CORPORATION, a tribal corporation chartered by the Gila River Indian Community, hereinafter be referred to as "**Sun Valley**" or "**Lessor,**" whose address is c/o Wild Horse Pass Development Authority, 20000 South Maricopa Road, Chandler, Arizona 85226, and BOB BONDURANT SCHOOL OF HIGH PERFORMANCE DRIVING, INC., an Arizona Corporation, hereinafter referred to as the "**Lessee,**" whose address is, 20000 S. Maricopa Road, Gate 3, Chandler Arizona 85226. This Lease is executed under the provisions of the Act of August 9, 1955, as amended (25 U.S.C. § 415, et seq.), as supplemented by Part 162.401, et seq., Leases and Permits, of the Code of Federal Regulations, Title 25 - Indians, and any amendments thereto relative to business leases on Indian trust lands, all of which by reference are made a part hereof.

## WITNESSETH

**A.** Lessor is the owner of a leasehold estate under Lease No. B-GR-71, dated March 4, 1974, approved by the Superintendent, Pima Agency, on March 4, 1971 ("Master Lease").

**B.** Lessee has occupied and operated its business on a subleased parcel under the Master Lease since April 7, 1993 and desires to sublease a parcel of land approximately 88.36 acres in size for the operation of automobile racing and driving schools, automobile racing, automobile video and motion picture work, automotive after-market modifications and repair related to racing, driving and high performance vehicles, and other related uses.

**C.** From April 1993 until April 2013 Lessee operated under a sublease with Firebird International Raceway Park Sports Promotions, Inc. ("Firebird") which held a sublease with Sun Valley under the Master Lease. Firebird's sublease with Sun Valley expired in April 2013.

**D.** By mutual understanding of the Lessor and Lessee, Lessee continued in possession and use of Parcel A (defined below) after Lessee's sublease with Firebird expired.

**E.** On or about December 4, 2014, Lessor and Lessee entered into a Letter Agreement documenting Lessee's continued use of Parcel A and Lessee's limited use of (i) the West Track (defined below) and (ii) the Wild Horse Pass Drag Strip Carousel/Looper (defined below). The Letter Agreement has remained in effect until the approval of this Sublease.

**F.** Lessee now desires to (i) lease Parcel A and the West Track for its exclusive use and enjoyment, subject to the provisions set forth in this Lease; (ii) be granted a right of way for ingress and egress to Parcel A and the West Track; and (iii) have limited use of the Wild Horse Pass Drag Strip Carousel/Looper (defined below).

1

**G.**    Lessor and Lessee desire to enter into (i) a new lease for Parcel A and the West Track (defined below); (ii) a right of way for ingress and egress to Parcel A and the West Track; and (iii) a license for nonexclusive use of the Wild Horse Pass Drag Strip Carousel/Looper (defined below), for a term commencing upon the date of commencement of the Lease Term, as defined herein, and otherwise on the following terms and conditions.

**H.**    Until the Master Lease expires, Lessee acknowledges that all its rights and authority under this Lease are subordinate and subject to all provisions in the Master Lease, as they may apply to the Lessee and that this Lease does not affect any duties, responsibilities, or liabilities of Lessor under the Master Lease, and all such duties, responsibilities, and liabilities shall remain in effect.

**I.**    Lessor and Lessee acknowledge that this Lease is subject to approval by the Gila River Indian Community and the Secretary.

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein, Lessor and Lessee agree as follows:

1.    **Definitions**.

For the purpose of this Lease, the following terms shall have the meanings set forth below:

**Affiliate**.  Any Person directly or indirectly, through one or more intermediaries, Controlling, Controlled by or under common Control with another Person, which, in the case of a partnership, shall include each of the general partners thereof and in the case of a limited liability company, shall include each manager or member thereof.

**Approved Encumbrance**.  A mortgage, deed of trust, lien or other security interest in or against Lessee's interest in the Leased Premises meeting the requirements of **Section 13** and as approved by the Secretary, Master Lessor and Lessor in accordance with **Section 13**.

**Approved Encumbrancer**.  The holder of an Approved Encumbrance.

**Building Codes**.  Building Codes shall mean the following codes which have been adopted by the Gila River Indian Community and codified in Title 19, Chapters 4, 5, 6, 7, 8, 9, 10, 11 and Title 21, Chapter 2 of the Gila River Indian Community Code as such codes may be amended and updated pursuant to Section 19.1305 and Section 21.405 of the Gila River Indian Community Code: the 2006 International Building Code, the 2006 International Mechanical Code, the 2006 International Plumbing Code, the 2005 National Electrical Code, the 2006 International Residential Code, the 2006 Performance Code for Buildings, the 2006 Fuel Gas Code, the 2006 International Property Maintenance Code, the 2006 Energy Conservation Code, the 2003 ANSI A117.1, and the 2003 International Fire Code.

2

**Common Utilities.** All utilities of the Community and/or any water and sewer lines or pipes, electric lines, wiring and conduits, equipment and appurtenances thereto that serve the Leased Premises and those that do not exclusively serve the Leased Premises and which are located on, in, through or below the Leased Premises.

**Community.** The Gila River Indian Community, a federally recognized Indian tribe, and its instrumentalities and agencies.

**Community Council.** The governing body of the Community known as the "Gila River Indian Community Council."

**Community Court.** The trial and appellate courts of the Gila River Indian Community, including a Supreme Court in the event that the Gila River Indian Community establishes such a court.

**Control.** The possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person.

**Day.** A calendar day commencing at 12:00 midnight local Phoenix, Arizona time.

**Default Rate.** The interest rate which is fifteen percent (15%) per annum.

**Governmental Authority.** Any governmental or quasi-governmental entity, regardless of how constituted, having or claiming jurisdiction over the Leased Premises or any portion thereof, or over the design, planning, construction, use, operation, maintenance or occupancy of all or any portion of the Leased Premises.

**Lease.** This Sublease BL _____.

**Lease Term.** As provided in **Section 3**.

**Lease Year.** Each period of twelve (12) consecutive months, commencing on each March 1st and ending on the last day of February the following year.

**Leased Premises.** That certain real property consisting of approximately 88.36 total acres all located within the leased premises of the Master Lease, comprised of Parcel A and the West Track, as more particularly and legally described in **Exhibit A**, attached hereto, and all other improvements and related structures, together with a right of ingress and egress thereto and all easements, rights-of-way, privileges, licenses, appurtenances and other rights and benefits belonging to, running with or in any way related to such real property.

**Legal Requirements.** All statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of federal and Community governmental entities and other governmental entities having jurisdiction affecting either the Leased Premises or the Carousel/Looper or the construction, use, occupancy, repair, renovation, replacement or alteration thereof or thereto, whether now or hereafter enacted and enforced, including

3

any of the same which may (i) require repairs, modifications or alterations in or to any portion of the Leased Premises; or (ii) in any way limit, restrict or impose conditions upon the use and authorizations and regulations relating to the Leased Premises, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Lessee (other than encumbrances created by Lessor without the consent of Lessee), at any time in force or effect pertaining to the Leased Premises or any portion thereof or interest therein.

**Lessee.** The Bob Bondurant School of High Performance Driving, Inc., an Arizona Corporation.

**Lessor.** The Sun Valley Marina Development Corporation, a tribal corporation chartered by the Gila River Indian Community.

**Lessor Approvals.** Approval of this Lease by the Community Council and the Secretary in accordance with applicable Federal law.

**Master Lease.** Lease No. B-GR-71 by and between the Gila River Indian Community and Sun Valley Marina Corporation, dated March 4, 1974, approved by the Superintendent, Pima Agency, on March 4, 1971 ("Master Lease").

**Master Lessor.** The Gila River Indian Community, a federally recognized Indian Tribe and sovereign nation.

**Material Renovations Amount or MRA.** Five Hundred Thousand and No/100 Dollars ($500,000.00) as adjusted annually on January 1st of each year in accordance with the changes in the Price Index as set forth in **Section 6.2**.

**Parcel A.** That certain real property consisting of approximately 47.1 acres located within the leased premises of the Master Lease, as depicted in **Exhibit B** attached hereto.

**Person.** An individual, corporation, limited liability company, partnership, joint venture, association, firm, joint stock company, trust, unincorporated association or other legal entity.

**Price Index.** The Consumer Price Index compiled and published by the United States Department of Labor, Bureau of Labor Statistics, designated **"Consumer Price Index"** for all Urban Consumers (**"CPI-U"**), U.S. City Average, 1982-1984 = 100. If at any time there shall not exist the Price Index, Lessor and Lessee shall substitute any official index published by the Bureau of Labor Statistics or by successor or similar government agency that may be in existence and which in their reasonable business judgment shall be most nearly equivalent thereto.

**Removable Personal Property.** All personal property, of every kind and nature, belonging to Lessee or any Sublessee, excluding, however, property which normally would be attached or affixed to the buildings, improvements or other portions of the Leased Premises in such a manner that such property would become a part of the realty,

4

regardless of whether such property is in fact so placed in or on or affixed to the buildings, improvements or other portions of the Leased Premises.

**Rent**. The amount specified in **Section 5.1**.

**Required Consent**. Any governmental approval or other consent, license, grant, authorization or agreement from any Governmental Authority or any public or private provider of public utility services, the procurement or maintenance of which may reasonably be necessary, desirable or appropriate as a condition or prerequisite to the proper development, improvement, use, occupancy or operation of all or any portion of the Leased Premises in accordance with the provisions of this Lease.

**Secretary**. The Secretary of the Interior, United States Department of the Interior or his or her authorized representative.

**Sublease**. A sublease of all or any part of the Leased Premises approved in accordance with **Section 11.1**.

**Sublessee**. A lessee of all or any portion of the Leased Premises pursuant to a Sublease.

**West Track**. That certain real property consisting of approximately 41.26 acres all located within the leased premises of the Master Lease, as depicted in **Exhibit C** attached hereto.

**2.** **Demise of Leased Premises, Access Easement and Use of Carousel/Looper**.

**2.1** For and in consideration of the Rent and agreements hereinafter set forth, Lessor hereby leases the Leased Premises to Lessee, and Lessee hereby leases and accepts the Leased Premises from Lessor.

**2.2** In addition to the Leased Premises, Lessor hereby grants to Lessee a non-exclusive access easement for access to the Leased Premises as depicted on **Exhibit D** hereto (the "**Access Easement**"). The Access Easement shall be coextensive with the Lease Term as defined in **Section 3**.

**2.3** For and in consideration of the compensation and agreements hereinafter set forth, Lessor hereby grants to Lessee a non-exclusive and limited license to access and use the Wild Horse Pass Motorsports Park area known as the Wild Horse Pass Drag Strip Carousel/Looper Section, as depicted on **Exhibit E** hereto (the "**Carousel/Looper**").

**2.4** The parties acknowledge and agree that Lessor shall retain a small area of land approximately 0.417 acres located within the Leased Premises where Lessor's current maintenance building is located ("**Lessor's Maintenance Area**"), as further depicted on **Exhibit F**. In addition, the parties acknowledge and agree that Lessor shall retain the right of ingress and egress over the current road on the Leased Premises in order to access Lessor's Maintenance Area. Lessor shall retain the exclusive right to use

5

Lessor's Maintenance Area, together with access thereto, until such time as the parties agree in an amendment to this Lease to add the Lessor's Maintenance Area to the Leased Premises. The rental rate that will be used in such amendment for the Lessor's Maintenance Area shall be determined by a third-party appraisal which values both the building(s) and land or alternatively, Lessee will be given the option to purchase the improvements on the Lessor's Maintenance Area at the fair market value rate and then apply the then current Parcel A price per acre to determine the monthly rent.

**3.** **Lease Term**. The term of this Lease (the **"Lease Term"**) shall commence on March 1, 2017 and shall expire on March 1, 2029.

**4.** **Uses of Leased Premises**.

**4.1** **Lessee's Exclusive Uses.** Subject to the limitations set forth in Section 4.3 below, Lessee shall have the right on the Leased Premises to engage in the following uses on an exclusive basis within the Wild Horse Pass Motorsports Park during the Lease Term: automobile race driver training courses and automobile driving schools (this exclusive use does not include any off-road automobile training courses or driving schools; or general driver training/instruction, not open to the public, that occurs during an event or track rental).

**4.2** **Lessee's Non-Exclusive Uses.** Subject to the limitations set forth in **Section 4.3** below, Lessee shall have the right on the Leased Premises to engage in the following uses on a non-exclusive basis within the Wild Horse Pass Motorsports Park during the Lease Term:

  **(a)** Automotive, Motorcycle, and Karting Events and Activities:

   **(i)** Sanctioned Racing & Motorsport events
   **(ii)** Automotive Club Events
   **(iii)** Race Team Testing
   **(iv)** Track days
   **(v)** Race Series
   **(vi)** Ride and Drive events

  **(b)** Racing, Automotive, High Performance Vehicle and Component Manufacturers Events and Activities:

   **(i)** Driving events
   **(ii)** OEM Ride & Drive events
   **(iii)** Product Showcase & Product Launch events
   **(iv)** Product Testing & Evaluation
   **(v)** Track Days
   **(vi)** Media Days
   **(vii)** Retail Merchandise Sales
   **(viii)** Repairs, Maintenance, and after-market modifications

6

        **(ix)**    Training courses or general driver training/instruction

        **(x)**    Membership/Club events

**(c)** Entertainment related Events and Activities:

        **(i)**    Car Show & Sales events

        **(ii)**    TV and Media Filming

        **(iii)**    Racing & Product Showcase Events

        **(iv)**    Charitable events that make use of Lessee's track and other facilities that are approved in advance by Lessor

        **(v)**    Related retail sales

**(d)** Other uses as may be approved by Lessor.

**4.3**    **Use Limitations.**

        (a)    Notwithstanding the foregoing in **Sections 4.1** and **4.2**, Lessor reserves the exclusive use of all uses not listed in **Sections 4.1** and **4.2** above, including but not limited to, automotive drag racing, motorcycle drag racing, boat drag racing and off-road racing. **Section 4.2** provides Lessee with a right to engage in retail merchandise sales and other retail sales; however, Lessee shall not have the right to develop a retail pad or sublease space for a retail store on the Leased Premises. Such retail sales as mentioned in **Section 4.2** shall be limited to (i) retail sales associated with temporary events; or (ii) retail sales of Bondurant brand products or related merchandise sold in Lessee's main office space for Lessee's sole benefit. The development and use of the Leased Premises will be consistent with this Lease unless otherwise approved by Lessor and Master Lessor and in accordance with the zoning ordinances and other Legal Requirements of the Community. During the Lease Term, Lessee may (a) develop the Leased Premises, (b) build commercial buildings on the Leased Premises, and (c) use the Leased Premises for any commercial uses as set forth herein and allowed by applicable zoning ordinances of the Community and any uses reasonably ancillary and related to such permitted uses. If Lessee or any Sublessee uses the Leased Premises for any use inconsistent with the provisions of this **Section 4** without the prior written permission of the Lessor and Master Lessor, such misuse shall, if not remedied in accordance with the provisions of **Section 17.1**, constitute a default and a breach of this Lease. Lessee agrees not to use or cause to be used any part of the Leased Premises or the Carousel/Looper for any unlawful conduct or purpose, illegal activity or negligent use or waste of the Leased Premises or Carousel/Looper. Lessee further covenants and agrees that it will not commit or permit on the Leased Premises or the Carousel/Looper any act that constitutes a nuisance, as defined by the laws of the Community, or which creates a hazard to health of persons or to property in violation of Legal Requirements. Lessee's use of the Leased Premises and the Carousel/Looper shall comply with all laws, ordinances and regulations applicable to the Leased Premises and the Carousel/Looper or Lessee's use thereof, including but not limited to the Environmental Laws, as defined in **Section 15.1(b)** hereof, the Community's zoning ordinance, applicable liquor laws and laws regulating fire and ambulance services. Except as set forth in **Section 15**, no Hazardous Materials,

as defined in **Section 15.3(a)(ii)** hereof, waste or combustible material shall be stored or used on the Leased Premises.

(b)     Lessor and Lessee agree that Lessor will honor Lessor's current track bookings with the third-party company, Apex, aka Private Motorsports, through May 2017. Lessor agrees that it will not book any further track rentals with Apex during the Lease Term.

5.     **Rent**.

5.1     **Rent**. Lessee covenants and agrees to pay to Lessor, without deduction or offset, in lawful money of the United States of America, the following sum (the "**Rent**"), subject to adjustments as set forth below:

(a)     **Parcel A Rent**. The initial annual Rent for Parcel A shall be $369,923.40, payable in advance in equal monthly installments of $30,826.95, beginning on the commencement of the Lease Term.

(b)     **West Track Rent**. The initial annual Rent for the West Track shall be $290,201.79, payable in advance in equal monthly installments of $24,183.48, beginning on the commencement of the Lease Term. In the first Lease Year of the Lease Term, Lessee shall receive a rent abatement in the amount of $94,601.79, meaning Lessee shall pay a total of $195,600.00 in the first Lease Year of the Lease Term, payable in advance in equal monthly installments of $16,300.00. Lessee shall receive a credit of $816.67 for each day that Lessor uses the West Track as agreed to by the parties in **Section 47**. Such credit shall be adjusted annually at the same rate and time as the base Rent. Any credits earned by Lessee shall be applied to the following month's Rent payment.

(c)     **Carousel/Looper Rent**. The initial base Rent for the use of the Carousel/Looper (9.5 acres) shall be $74,613.00, payable in advance in equal monthly installments of $6,217.75, beginning on the commencement of the Lease Term. Lessee shall receive a credit of $204.42 for each day that Lessor uses the Carousel/Looper during business hours in any given month. Such credit shall be adjusted annually at the same rate and time as the base Rent. Any credits earned by Lessee shall be applied to the following month's Rent payment.

(d)     **Payment**. All monthly rent payments shall be paid in advance on or before the 1st day of each month. The Rent for Parcel A and the Carousel/Looper is calculated using an initial rent rate of $7,854.00 per acre per year. The Rent for the West Track is calculated using an initial rent rate of $7,126.00 per acre per year.

(e)     **Adjustments to Rent**. All Rent payments shall be adjusted annually as of each March 1st during the Lease Term based on the change in the Price Index. The "Base Index" for the adjustment shall be the September 2012 Index. The September 2012 CPI is 231.4. On each March 1st during such period, the then current Rent, as previously adjusted pursuant to this subsection, shall be increased by the

8

percentage of change which the Price Index published immediately prior to the relevant March 1st has increased when compared to the Base Index. The formula for adjustment shall be:

$$\text{Adjusted Rent} = \frac{\text{Current Rent x Price Index preceding Relevant March 1}^{st}}{\text{Base Index}}$$

the adequacy of compensation or adjustment by the Secretary is required as set forth in 25 CFR §162.428.

**5. 3    Payment.**

      **(a)**    Monies payable under this Lease as Rent or otherwise shall be payable directly to Lessor. Such direct payments shall be made to Lessor, in care of the General Manager of Sun Valley Marina Development Corporation, 20000 S. Maricopa Road, Chandler, Arizona 85226, who shall receive all payments for and on behalf of Lessor.

      **(b)**    All Rent shall be paid without prior notice or demand on or before the date due as set forth in this Lease. Rent not paid when due shall bear interest at the Default Rate from the date due until paid, but this provision shall not be construed to relieve Lessee from its obligation to make timely Rent payments or from the operation of the provisions of this Lease relating to default.

      **(c)**    **Rental Bond**. Lessor and Lessee hereby request and the Secretary hereby grants a waiver of the requirement for the Lessee to obtain a performance bond covering rent payments due the Lessor under this Lease. Unless Lessor shall reinstitute the requirement for a rental bond, by providing written notice to Lessee, due to a default on the part of the Lessee under the terms of this Lease, the Lessee shall not be required to obtain a performance bond covering rent payments during the Lease Term.

**6.    Lessee Improvements**.

      **6.1    Construction Obligations**. All buildings and improvements placed or constructed on the Leased Premises by Lessee ("Lessee Improvements"), whether under the term of any prior lease or agreement or the Lease Term hereof, shall be owned by the Lessor. Additionally, any and all buildings and improvements placed or constructed on the Leased Premises during the Lease Term hereof shall be constructed in a good and workmanlike manner and in compliance with all Legal Requirements and the Building Codes, as may then be in effect. Lessee shall, however, during the Lease Term be solely entitled to any rights or benefits associated with the Lessee Improvements, including but not limited to, any depreciation, investment tax credits or other tax benefits, and the Lessee Improvements are not made in lieu of Rent. Lessor hereby waives the requirement for Lessor to approve any general construction schedules for Lessee Improvements less than the Material Renovations Amount. For any Lessee Improvements in excess of the Material Renovations Amount, Lessee shall provide a plan that describes the type and location of the Improvements to be constructed, a copy of the construction schedule (including dates for

9

commencement and completion of construction) and budget for the project and shall obtain Lessor's prior written approval for any material changes in the construction schedule, such approval shall not be unreasonably withheld.

**6.2** **Lessee Maintenance, Repair, Alteration**. Lessor shall not be responsible for or required to maintain any building improvements on the Leased Premises, including the existing improvements, the Lessee Improvements, or any other improvements on the Leased Premises (collectively the "Improvements"). Lessee shall, at all times during the Lease Term, and at Lessee's sole cost and expense be responsible for making all repairs and replacements (including but not limited to structural repairs and roof repairs) necessary to maintain the Leased Premises and all Improvements thereon in good order, repair, and condition, which is defined as the same condition as of the commencement of the Lease Term and in compliance with all Legal Requirements and Building Codes except (i) as built, repaired, rebuilt, or altered pursuant to this Lease, (ii) for ordinary wear and tear, and (iii) for damage by casualty that Lessee is not required to repair. Lessee shall maintain the landscaping on the Leased Premises in a neat and orderly condition and shall replace all dead or diseased plant materials. All waste shall be removed from the Leased Premises in accordance with the Legal Requirements. However, Lessor shall maintain, at no cost or expense to Lessee, all Common Utilities. Furthermore, Lessor shall work with the Master Lessor and any of Master Lessor's relevant departments that are responsible for maintaining the existing landscaping that is located between the exterior of the existing chain link fence and Maricopa Road, as depicted in **Exhibit G** hereto, and such maintenance shall include weed control and shall be at no cost to Lessee.

All service areas constructed on the Leased Premises after the commencement of the Term hereof shall be screened from public view pursuant to the building plans for such improvements. Lessee shall have the right at any time during the Lease Term to make limited alterations, additions or repairs to any improvement on the Leased Premises in an amount not to exceed the Material Renovations Amount ("MRA") during any Lease Year. Such sum shall be subject to adjustment in accordance with changes in the Price Index. Provided, however, that in no event shall the MRA in any year be less than the MRA for the preceding year. Except for actions authorized under **Section 27**, removal or demolition of any improvements, alterations, additions or repairs to any improvements in excess of the MRA shall not be made without the prior written consent of the Lessor, which consent and approval shall not be unreasonably withheld or delayed. Lessee shall prepare and submit its plans for removal or demolition of improvements or alterations, additions or repairs to any improvements in excess of the MRA to Lessor in writing. Unless earlier approved, or rejected in writing, such plans shall be deemed approved thirty (30) days following submission. Lessee shall, at all times during the Lease Term and at Lessee's sole cost and expense, maintain the Leased Premises and all improvements thereon in good order and repair and in compliance with all Legal Requirements and Building Codes in effect on the date of the Lessee's construction of such improvements, alterations, additions or repairs to or on the Leased Premises.

10

7. **Indemnification**. Neither Lessor, the Master Lessor, the Secretary nor the United States, nor their officers, agents and employees shall be liable for any loss, damage or injury of any kind whatsoever to the person or property of Lessee or Sublessees or any other person whomsoever, caused by any use or occupation of the Leased Premises or the Carousel/Looper, or by any defect in any structure erected thereon, or arising from an accident, fire or other casualty on the Leased Premises or the Carousel/Looper or from any other cause whatsoever, unless such loss, damage or injury is attributable to the negligence or willful misconduct of Lessor, the Master Lessor, the Secretary or the United States. Lessee hereby waives all claims against Lessor, the Master Lessor, the Secretary and/or the United States arising from the condition of the Leased Premises and the Carousel/Looper unless such condition is caused by the negligence or willful misconduct of Lessor, the Master Lessor, the Secretary or the United States. Lessee agrees to indemnify, defend and hold Lessor, the Master Lessor, the Secretary, and United States harmless for, from and against any loss, damage or injury, together with all costs and expenses in connection therewith, including reasonable attorneys' fees, resulting from Lessee's use or occupation of the Leased Premises or the Carousel/Looper. Lessor agrees to indemnify, defend and hold Lessee harmless for, from and against any loss, damage or injury, together with all costs and expenses in connection therewith, including reasonable attorneys' fees, resulting from the negligence or willful misconduct of Lessor.

8. **Non-Responsibility Notices**. Prior to the commencement of construction of any improvements on the Leased Premises, or any repair or alteration thereto, Lessee shall give Lessor, Master Lessor and, if required by Federal law, the Secretary ten (10) days advance notice in writing of Lessee's intention to begin such construction, repair or alteration, in order that non-responsibility notices may be posted and recorded as may be provided by any Legal Requirements. Lessor hereby authorizes the Secretary to post said notices on Lessor's behalf. Nothing contained in this Lease shall be construed as a waiver of the immunity of trust or restricted property from mechanic's or materialmen's liens or as an obligation of the Secretary or Lessor to post non-responsibility notices while the Leased Premises is in a trust or restricted status.

9. **Performance Bond**. Before beginning construction of any new buildings or exterior improvements on the Leased Premises in excess of the Material Renovations Amount, Lessee agrees to provide security to guarantee completion of the buildings and improvements and payment in full of claims of all persons for work performed on, or materials furnished for construction on the Leased Premises. Lessee shall provide said security by one of the following means:

9.1 **Payment Bond**. Lessee may post a labor and materials payment bond in an amount equal to the cost of each building or other improvement. Lessor hereby acknowledges that AIA Form 311 and Form 312 labor and materials payment and performance bonds shall be acceptable. Such bonds shall identify Lessor, the Master Lessor, and the Secretary as co-obligees, shall be recorded in the official records of Maricopa County, Arizona and shall be filed with the Secretary and shall remain in effect until the buildings and improvements are satisfactorily completed. Said bond shall be conditioned upon the faithful

11

performance of Lessee, in completing the buildings and improvements as provided for in this Lease, and shall be further conditioned on the payment by Lessee of all just claims of all persons for work performed on or materials furnished for construction. The bond shall allow the right of action to recover upon the bond in any suit brought for failure to complete the buildings and improvements and/or for failure to pay for work performed or in material furnished for construction.

**9.2** **Other Forms of Security**. Lessee may deposit in escrow, with an institution reasonably acceptable to Lessor, negotiable United States Treasury Bonds or other forms of security set forth in 25 CFR §162.435(a), in an amount sufficient to pay the entire cost of construction of each building or other improvement then to be erected on the Leased Premises. The escrow instructions shall include provisions for disbursement in installments upon certification of Lessee's architect as construction progresses. Lessor shall have access to all information relative to the disbursement of funds through said escrow. The escrow instructions shall also provide that not less than ten percent (10%) of such funds shall be withheld by the escrow holder until the period fixed by law for the filing of all mechanics' or materialmen's liens on such improvement shall have expired or until a reasonably acceptable title company issues a title insurance policy which, in substance, insures Lessor against any loss it shall sustain by reason of any statutory liens for labor or material arising out of any work or improvement described in said escrow instructions; that if mechanics' or materialmen's liens are filed, the funds so withheld shall then be used to discharge such liens; and that if no such liens are filed within the statutory period for filing, the withheld funds shall then be disbursed to Lessee. If U.S. Treasury Bonds are provided, Lessee agrees to make up any deficiency caused by a decrease in the value of the deposited U.S. Treasury bonds.

**9.3** **Other Bond Requirements**. The Lessor, upon consultation with the Secretary, may adjust the bond requirements to reflect changing economic conditions. Each performance bond or other security shall require the surety to provide no less than sixty (60) days advance notice to Lessor and Secretary before such performance bond or other security may be canceled. Lessee shall comply with 25 CFR 162.413(a)(9) with respect to a bond or security issued pursuant to this Section.

**10.** **Insurance**.

**10.1** **Commercial General Liability**. At all times during the Lease Term, Lessee shall procure and maintain commercial general liability insurance coverage with minimum limits of One Million Dollars ($1,000,000.00) per occurrence and Five Million Dollars ($5,000,000.00) general aggregate coverage. All policies shall be written to protect Lessee, Lessor and Master Lessor by naming Lessor and Master Lessor as additional insureds, as their interests may appear and include a waiver of subrogation as set forth in **Section 10.7**. The

12

Commercial General Liability policy shall also include coverage for claims of mental anguish under the bodily injury coverage.

**10.2** **Business Automobile Liability**.  At all times during the Lease Term, Lessee shall procure and maintain business automobile liability insurance coverage with minimum limits of One Million Dollars ($1,000,000.00) per occurrence and Five Million Dollars ($5,000,000.00) general aggregate coverage. All policies shall be written to protect Lessee, Lessor and Master Lessor by naming Lessor and Master Lessor as additional insureds, as their interests may appear and include a waiver of subrogation as set forth in **Section 10.7**.  The Commercial General Liability policy shall also include coverage for claims of mental anguish under the bodily injury coverage.

**10.3** **Excess Liability.**  At all times during the Lease Term, Lessee shall procure and maintain Excess Liability insurance coverage in the amount of Five Million Dollars ($5,000,000.00) in the aggregate.  Such excess liability policy shall provide coverage as broad as the underlying policies.

**10.4** **Workers Compensation Insurance.**  At all times during the Lease Term, Lessee shall procure and maintain Employer's Liability insurance coverage as required by Arizona law with the following limits: (i) One Million Dollars ($1,000,000.00) per accident for bodily injury by accident; and (2) One Million Dollars ($1,000,000.00) per employee for bodily injury by disease with a policy limit of One Million Dollars ($1,000,000.00).

**10.5** **Evidence of Insurance.**  Unless otherwise specified by Lessor, the evidence of insurance shall be in a form of an insurance certificate showing the required coverage and containing the undertaking of the insurer to endeavor to give notice to Lessor, as a certificate holder, at least thirty (30) days (ten (10) days in case of non-payment of premium) before a cancellation of any of the listed insurance policies.  Lessee shall provide a certificate with respect to replacement or renewal policies prior to the expiration date of then-existing policies.

**10.6** **Fire and Damage Insurance**.

    **(a)** **Insurance Requirements**.  Lessee shall, from the date of the approval of this Lease and thereafter, carry or cause its Sublessees to carry fire insurance with extended coverage endorsements, to include vandalism, covering the full replacement cost of all improvements on the Leased Premises, and naming Lessor, the Master Lessor, and the United States as additional insured parties.  Evidence reasonably acceptable to Lessor, the Master Lessor, and the Secretary of such coverage shall be furnished to Lessor, the Master Lessor and, if required by Federal law, to the Secretary.  Lessee shall pay or cause its Sublessees to pay all premiums and other charges for such insurance and shall, upon request, furnish satisfactory evidence thereof.

13

**(b)** **Damage and Proceeds**. In the event of damage to any improvements on the Leased Premises, subject to the provisions of any Approved Encumbrance or Sublease to the contrary, Lessee shall demolish or restore, or cause to be demolished or restored the damaged improvements in compliance with applicable Legal Requirements. Lessee's work shall commence and be completed within a reasonable time after the damage occurs and shall be pursued diligently. Insurance proceeds shall be held by Lessee's insurer or with an institution approved by Lessor, subject, however, to the provisions of any Approved Encumbrance or Sublease to the contrary. All funds shall be disbursed during the progress of the work on proper architect's, engineer's or contractor's certificates.

**(c)** **Excess Proceeds**. If Lessee is not then in default under this Lease (any required notice having been given and any applicable cure period having expired), all money remaining in escrow after demolition or restoration has been completed shall be paid to Lessee. If a default has taken place which remains uncured, said money shall remain in escrow as security for performance by Lessee until said default is corrected, at which time, such funds remaining in escrow shall be paid to Lessee. If Lessee does not correct the default within the time frames set forth in **Section 17.1**, such funds as are necessary to correct the default shall be paid to Lessor, and the balance shall be paid Lessee.

**10.7** **Waiver of Subrogation.** To the extent permitted by law, and without affecting the coverage provided by the insurance required to be procured and maintained hereunder, Lessee waives any right to recover against the Lessor on account of any and all claims Lessee may have against the Lessor with respect to any loss or damage insured against under the insurance required under this Agreement.

**10.8** **Insurers**. Insurance policies shall be furnished and maintained by such responsible companies as are rated A+VIII or better in the then current edition of the Best's Insurance Guide and are authorized to do business in the state of Arizona. Performance and payment bonds shall be furnished and maintained by responsible companies as are rated A+VIII or better.

**11.** **Sublease, Assignment and Transfer**.

**11.1** **Sublease**. Lessee shall not, except as expressly authorized herein, sublease all or any part of the Leased Premises, without the approval of the Lessor and the Master Lessor which approvals will not be unreasonably withheld or delayed. No Sublease shall be valid or binding without the approval of Lessor and the Master Lessor and then only upon the condition that each Sublessee has agreed in writing that, in the event of conflict between the provisions of this Lease and of its Sublease, the provisions of this Lease shall govern. The Lessor and the Master Lessor shall either approve or state with reasonable specificity their

14

reasons for disapproval of a proposed Sublease within sixty (60) days after the proposed sublease is submitted for approval. The failure of the Lessor and/or Master Lessor to approve or provide specific reasons for disapproval within such sixty (60) day period shall be deemed to constitute approval of such Sublease. Pursuant to 25 CFR §162.453, the Secretary may waive its approval requirements for subleases and other subleasehold rights, including leasehold easements and covenants, conditions and restrictions. Lessor hereby requests and the Secretary hereby grants such a waiver by Secretary of such sublease approvals, provided that (i) the proposed Sublease does not relieve the Lessee of any liability under the Lease; (ii) Lessee has submitted a copy of the executed Sublease to the BIA Superintendent, Pima Agency, Box 8, Sacaton, Arizona 85147 within thirty (30) days of its execution by the parties; and (iii) the proposed Sublease meets the requirements of 25 CFR §162.453(b).

**11.2** **Assignment or Transfer**. Lessee shall not assign or transfer this Lease or any right to or interest in this Lease or any of the improvements or the Leased Premises without the prior written approval of Lessor, the Master Lessor and, if required by Federal law, the Secretary and no such assignment or transfer shall be valid or binding without such prior written approval, and then only upon the conditions that the assignee or other successor in interest, excepting an Approved Encumbrancer, shall agree in writing to be bound by each and all of the covenants and conditions of this Lease. Should Lessee attempt to make any such assignment transfer, except as aforesaid, such action shall be deemed a breach of this Lease, excepting that an Approved Encumbrancer may enforce rights in the manner provided in the relevant Approved Encumbrance. Approval of any assignment or transfer only shall apply to such assignment or transfer, and the restriction of this **Section 11.2** shall apply to and shall be severally binding upon each and every assignee, transferee and other successor in interest of Lessee in connection with such assignment or transfer, excepting an Approved Encumbrancer. Consent to an assignment or transfer shall not be unreasonably withheld.

**11.2.1** For purposes of **Section 11.2**, a "transfer" shall include, but shall not be limited to, the following:

(1)     any dissolution, merger, consolidation, or other reorganization of the Lessee,

(2)     the sale or other transfer of 25% or more of the capital stock of the Lessee,

(3)     the sale of 25% or more of the value of the assets of the Lessee, or

(4)     the entering into of any operating agreement, consulting agreement or other arrangement, the effect of which is to shift from Lessee to a third party (i) substantial operating control of the Leased Premises or Lessee's operations thereon or (ii) substantial

15

economic benefit arising from the Leased Premises or Lessee's operations thereon.

**11.3    Third Party Rent.**  If the per acre rent or other consideration to be paid by a sublessee, assignee or transferee to Lessee (the "Third Party Per Acre Rent") exceeds the per acre Rent due from Lessee for the Leased Premises (the "Per Acre Rent"), Lessee shall pay to Lessor, as additional Rent, fifty percent (50%) of the difference between the Third Party Per Acre Rent and the Per Acre Rent multiplied by the number of acres subject to the sublease, assignment, or transfer (the "Third Party Acreage").  Lessee shall pay such additional Rent to Lessor at the same time or times the same is paid by such sublessee, assignee or transferee. For purposes of this **Section 11.3**, the additional Rent to be paid by Lessee shall be calculated as follows:

$$\frac{\text{Rent due under the sublease, assignment, or transfer}}{\text{Third Party Acreage}} = \text{Third Party Per Acre Rent}$$

$$\frac{\text{Rent due under this Lease}}{\text{total number of acres comprising the Leased Premises}} = \text{Per Acre Rent}$$

(Third Party Per Acre Rent – Per Acre Rent) x Third Party Acreage = Additional Rent

## 12.    Status of Lease.

**12.1    Termination of the Master Lease.**  Termination of the Master Lease, by cancellation or otherwise (including expiration), shall not serve to cancel this Lease but shall operate as an assignment to Master Lessor of this Lease and all Rent payments shall attorn to Master Lessor.  Provided that Lessee is not in default under the terms of this Lease (any required notice having been given and any applicable cure period having expired), Master Lessor shall honor this Lease and shall not disturb the tenancy of Lessee.  Further, such assignment to the Master Lessor shall be free and clear of any claims, debts, demands, dues, actions or causes of action which Lessee may have against Lessor.

**12.2    Conflicts with the Master Lease.**  If any provision in this Lease is inconsistent with any provision in the Master Lease, and if this Lease is approved by the Master Lessor and the Secretary, the provision in this Lease prevails.

## 13.    Approved Encumbrance.  Lessee, from time to time during the Lease Term, may make one or more Approved Encumbrances upon Lessee's leasehold interest in this Lease, or any part thereof, or any of the improvements on the Leased Premises by mortgage to any person, firm, corporation or other entity or combination thereof, and, subject to **Section 11.2**, assign this Lease, or any part or parts thereof, as collateral security therefor provided as follows:

**13.1    Copies.**  Lessee or the holder of the Approved Encumbrance shall promptly deliver to Lessor and, if required by Federal law, to the Secretary in the manner herein provided for the giving of notice to Lessor, a true copy of the

16

Approved Encumbrance and of any assignment thereof, and shall notify Lessor of the address to which notices may be sent.

**13.2    Use of Proceeds.**  Each Approved Encumbrance shall be utilized for the development or improvement of the Leased Premises, financing, refinancing, financing during the assignment of this Lease, permanent financing or financing following completion of construction in such amount as Lessee determines to be appropriate and Lessor, the Master Lessor and the Secretary may approve, or to secure such other obligations as Lessor, the Master Lessor and the Secretary may approve.

**13.3    Reversionary Interest.**  No Approved Encumbrance shall extend to or affect the reversionary interest and estate of Lessor and the Master Lessor in and to the Leased Premises, or in any way attach to or affect the Leased Premises from and after any expiration or termination of this Lease.

**13.4    Lessor Right to Cure.**  An Approved Encumbrance shall provide that any notice of default thereunder shall be delivered to Lessor and the Master Lessor, as well as to Lessee, and that Lessor shall have the right to cure such default if Lessee fails to do so.  Lessor shall have the same time period as is available to Lessee within which to cure a default, which time period will not commence until the expiration of the time period available to Lessee.  Neither Lessor's right to cure a default nor Lessor's exercise of such right shall be deemed to be an assumption by Lessor of liability under the Approved Encumbrance.

**13.5    Consent to Cancellation or Amendment.**  From and after receiving notice of the existence of an Approved Encumbrance, Lessor, the Master Lessor and Lessee shall not mutually agree to cancel, surrender, modify or amend this Lease in any respect without the prior written consent of the Approved Encumbrancer.

**14.    Liens, Taxes, Assessments, Utility Charges.**  Lessee shall not permit to be enforced against the Leased Premises, or any part thereof, any liens arising from any work performed, materials furnished, or obligations incurred by Lessee, and Lessee shall discharge or post a bond against all such liens before an action is brought to enforce the same.  Lessee shall pay, prior to delinquency, all taxes, assessments, licenses, fees and other like charges levied during the Lease Term upon or against the Leased Premises or any improvements located thereon, all interests therein and property thereon, for which either Lessee or Lessor may become liable.  Upon written request, Lessee shall furnish to Lessor, the Master Lessor and the Secretary written evidence, duly certified, that any and all liens required to be paid by Lessee have been paid, satisfied, or otherwise discharged.  Lessee shall have the right to contest any claim or assessment against the Leased Premises or any interests therein and property thereon by posting bonds to prevent enforcement of any lien resulting therefrom.  Lessee agrees to protect and hold harmless Lessor, the Master Lessor, the Secretary, the Leased Premises and all interests therein and improvements thereon from any and all claims, assessments and like charges and from any lien therefor or sale or other proceedings to enforce payment thereof, and all costs in

17

connection therewith. Lessor and the Secretary shall promptly execute and deliver for filing any appropriate documents with reference to the real estate tax exemption of the Leased Premises when so requested by Lessee. In addition to the Rent, Lessee shall pay all charges for water, sewerage, gas, electricity, telephone and other utility services supplied to the Leased Premises for Lessee's use directly to the utility providers as the same shall become due. Lessee agrees that Lessee and its sublessees, if any, shall pay the applicable Community taxes that are in effect during the term of the Lease Term and that are uniformly applied to the commercial activities of other persons or entities. This **Section 14** shall survive the termination of this Lease.

> **14.1** **Community-owned Utilities**. Without limiting the generality of other provisions of this Lease, Lessee hereby acknowledges and agrees that all utility services furnished to the Leased Premises shall be obtained through Community-owned entities, agencies, departments, or subdivisions, where such utility services are offered and available from Community-owned entities, agencies, departments, or subdivisions, which shall include without limitation gas, water, electric, telecommunication, telephone, television, cable, fiber optics, solid waste disposal and sewer facilities.

**15.** **Environmental Protection Requirements**. Lessee shall strictly comply with all applicable federal and Community Environmental Laws. Lessee is responsible for any costs incurred in effecting such compliance regarding this Lease, and for securing all necessary permits for any activity approved under the terms of this Lease. Environmental mitigation measures required by any governmental authority having regulatory jurisdiction over the Leased Premises shall be strictly adhered to by Lessee.

> **15.1** **Special Definitions Related to Environmental Protection**.
>
> > **(a)** **"DEQ"** means the Community's Department of Environmental Quality responsible for environmental protection.
> >
> > **(b)** **"Environmental Laws"** means any Community or applicable federal environmental statute, common law duty, regulation, policy, procedure, standard or ordinance now in effect or that may be promulgated in the future, as such statutes, regulations, standards and ordinances may be amended from time to time, that deal with the regulation or protection or pollution of the environment, including the ambient air, groundwater, surface water, and land use, including sub-strata land, and including but not limited to the following: Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("**CERCLA**"), 42 U.S.C. § 9601, et seq.; the Resource Conservation and Recovery Act ("**RCRA**") 42 U.S.C. § 6901, et seq.; the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq. seq.; the Clean Air Act, 42 U.S.C. § 7401 et seq.; the Clean Water Act, (33 U.S.C. §1362(6)); the Safe Drinking Water Act, 42 U.S.C. § 3001 et seq.; the Emergency Planning and Lessor Right-to-Know Act, 42 U.S.C. § 11001 et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq.; and any amendments to the foregoing.

18

**15.2 Historic Preservation and Archeological Resources.** Lessee acknowledges the particular relevance and applicability of federal and Community laws pertaining to the protection and preservation of historic and archeological resources on Indian lands, which resources are widespread throughout the Gila River Indian Reservation. Such laws include, without limitation, the Historic Preservation Act of 1966, the Archeological Resources Protection Act of 1979, the Native American Graves Protection and Repatriation Act of 1991, and the Community's Antiquities Ordinance of 1986, Code § 19-1 et seq. Lessee agrees to strict compliance with such laws for purposes of development and use of its Leased Premises and the Carousel/Looper and further agrees, during the term of this Lease to notify the Community's Cultural Resources Management Program and the Secretary immediately upon the discovery or reasonable suspicion of the presence of archeological resources within the Leased Premises or the Carousel/Looper. Upon such occurrence, Lessee shall obtain written direction from and comply with the Cultural Resources Management Program regarding how to proceed and the appropriate disposition of such discovery.

**15.3 Hazardous Materials.**

    (a)    **Special Definitions Related to Hazardous Materials.**

        (i)    **"Hazardous Materials Laws"** means all laws, ordinances, rules, decrees, orders, standards, procedures, policies or regulations of any federal or Community governmental authority relating to hazardous substances, hazardous materials, hazardous waste, toxic substances, including but not limited to, CERCLA, RCRA, the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq. and any amendments to the foregoing.

        (ii)    **"Hazardous Materials"** means: (1) hazardous materials, hazardous wastes, and hazardous substances as those or similar terms are defined under any Environmental Laws; (2) petroleum and petroleum products, including crude oil and any fractions thereof; (3) natural gas, synthetic gas, and any mixture thereof; (4) asbestos and/or any material which contains any hydrated mineral silicate, including but not limited to chrysotile, amosite, crocidolite, tremolite, anthophyllite and/or actinolite, whether friable or non-friable; (5) PCBs or PCB-containing materials or fluids; (6) radon; (7) explosives; (8) radioactive materials; (9) toxic substances; (10) poly-chlorinated biphenyls and similar materials; and (11) any other substance or material with respect to which any federal, state, local or Community Environmental Laws or governmental agency requires environmental investigation, monitoring, regulation or remediation.

19

(iii)    **Amendments**.    Any reference to a specific statute, common law duty, regulation, policy, procedure, standard or ordinance includes any amendment thereto or any successor statute, common law duty, regulation, policy, procedure, standard or ordinance.

**(b)**    **Use**.  Lessee shall not allow any Hazardous Material to be used, generated, released, stored or disposed of on the Leased Premises and the Carousel/Looper, unless:  (i) such Hazardous Materials are (A) used, generated, stored, or disposed of, as applicable in the construction, repair, operation or maintenance by Lessee of the Leased Premises or the Carousel/Looper (including the businesses and activities permitted pursuant to **Section 4** which are conducted by Lessee on the Leased Premises or the Carousel/Looper), (B) used in normal commercial or retail applications, or (C) sold as retail consumer products; and (ii) such use in compliance with the provisions of this **Section 15**.

**(c)**    **Compliance with Laws**.  Lessee's use of Hazardous Materials on the Leased Premises and Carousel/Looper shall be in compliance with all Hazardous Materials Laws and Environmental Laws.  Lessee shall obtain and maintain in full force and effect all permits, licenses and other governmental approvals required for Lessee's use of Hazardous Materials on the Leased Premises and Carousel/Looper under such laws and shall comply with all terms and conditions thereof.  Upon request, Lessee shall deliver copies of, or allow Lessor to inspect, all such permits, licenses and approvals. Lessee shall perform any monitoring, investigation, clean-up, removal and other remedial work (collectively, **"Remedial Work"**) required as a result of any release or discharge by Lessee of Hazardous Materials on the Leased Premises or the Carousel/Looper or any violation of Hazardous Materials Laws or Environmental Laws by Lessee.  All completed Material Safety Data Sheets ("MSDS") forms must be kept at the facility and made available upon demand by Lessor.  Lessee will promptly supply such MSDS forms to the Community Fire Department, the DEQ and the Community Environmental Health Program upon the receipt of the completed MSDS forms from the supplier.

**(d)**    **Compliance with Insurance Requirements**.  Lessee shall comply with the requirements of its insurers regarding the use by Lessee of Hazardous Materials at the Leased Premises and the Carousel/Looper and with such insurers' recommendations based upon prudent industry practices regarding management of Hazardous Materials.

**(e)**    **Notice and Reporting**.  Lessee shall notify Lessor, Master Lessor, and, in accordance with the Community's Emergency Planning and Community Right to Know Ordinance, No. GR-01-02, Section 7303, Emergency Notification, the Community's Department of Environmental Quality ("DEQ") immediately by fax (520-562-2245) or telephone (520-

20

562-2234), or other numbers as may be provided by DEQ, which shall be confirmed by written notice to the Department of Environmental Quality, 35 Pima Street, P.O. Box 97, Sacaton, Arizona 85147 and to the Lessor and Master Lessor within two (2) days after the occurrence of any of the following: (i) a known release or discharge by Lessee of any Hazardous Materials in violation of Hazardous Materials Laws or Environmental Laws and, in addition, Lessee shall notify the Community promptly upon learning of such incident by calling the Community on its 911 telephone number (or its successor); (ii) Lessee's receipt of any order of a governmental agency requiring any Remedial Work pursuant to any violation by Lessee of Hazardous Materials Laws or Environmental Laws; (iii) Lessee's receipt of any notice of violation by Lessee of any Hazardous Materials Law or Environmental Law; (iv) Lessee's receipt of notice of any claims made by any third party against Lessee relating to any loss or injury resulting from the generation, release, storage or disposal at the Leased Premises or the Carousel/Looper by Lessee of Hazardous Materials; or (v) known delivery to the Premises of Hazardous Materials from any source, to be reported pursuant to the manifest requirements of 40 CFR § 261.

(f) **Termination; Expiration**.  Upon the termination or expiration of this Lease, Lessee shall remove from the Leased Premises and the Carousel/Looper any equipment, improvements or storage facilities installed by Lessee and utilized by Lessee in connection with any Hazardous Materials and shall clean up, detoxify, repair, remediate, and otherwise restore Leased Premises and Carousel/Looper to a condition such that Hazardous Materials generated, released, stored or disposed of by Lessee on the Leased Premises and Carousel/Looper, if any, are not present in concentrations requiring Remedial Work under Hazardous Materials Laws and Environmental Laws.  Lessee shall not be deemed a tenant in possession whether by holdover or otherwise during any required clean-up.

**15.4    Water Pollution Prevention**.

(a) **Discharge or Spillage**.  Lessee agrees to design and operate its activities so as to preclude or prevent the discharge or accidental spillage of pollutants, as that is defined by the Clean Water Act (33 U.S.C. § 1362(6)), into flowing or dry watercourses, lakes, ponds, wetlands, any other waters of the United States, or any underground water sources within the Leased Premises or Carousel/Looper.  Lessee shall not deposit or stockpile excavated, construction or industrial materials or debris within fifty (50) feet of any watercourses within the Leased Premises or Carousel/Looper.

(b) **Storm Water Runoff**.  Lessee agrees to design and operate its activities in such a way that storm water runoff is contained and controlled

21

as required by Legal Requirements with respect to the Leased Premises. Lessee shall comply with all applicable Environmental Laws pertaining to runoff, including but not limited to all applicable provisions pertaining to industrial storm water runoff in 33 U.S.C. § 1342(p). Lessee shall file for review with the DEQ a copy of their storm water runoff plan.

**15.5** **Solid Waste Disposal Storage or Industrial Liquids**.

**(a)** **Solid Waste**. It shall be Lessee's responsibility to arrange for disposal of all solid waste as defined by 42 U.S.C. § 6903(27) generated by Lessee or generated within the Leased Premises or Carousel/Looper in a manner consistent with Environmental Laws, including but not limited to, 42 U.S.C. § 6901 et seq. and 25 C.F.R. Part 258. Open dumping, burial, or stockpiling of solid waste within the Leased Premises or Carousel/Looper is strictly prohibited. Lessee shall contain organic solid waste subject to decomposition so as to prevent access by birds, animals or other disease vectors, and shall arrange for haulage of all solid waste no less than once per week to a solid waste facility operating in compliance with Legal Requirements.

**(b)** **Storage of Industrial Liquids**. Lessee shall comply strictly with the provisions of Community Environmental Laws and 42 U.S.C. § 6991 et seq. and all implementing regulations thereto. Any proposed construction of storage tanks for holding regulated substances as defined in 42 U.S.C. § 6951(2) by a Sublessee within the Leased Premises shall be disclosed to Lessor and the Community Fire Department, the DEQ and the Community Environmental Health Program prior to the construction of such tanks. In addition to the foregoing, no storage tank shall be located within fifty (50) feet of any waterway, dry or flowing, and all such storage tanks shall be placed within separate secondary protective, impermeable containment whose performance equals or exceeds such liner as required by 40 C.F.R. § 258.40. Lessee shall submit to DEQ all Underground Storage Tanks spill mitigation plans and pollution prevention measures, as well as compliance review.

**15.6** **Indemnification**.

**(a)** **Obligation**. Except to the extent of any conditions which pre-date April 7, 1993 or migrate onto the Leased Premises or the Carousel/Looper from other lands of Lessor, Lessee shall protect, indemnify, defend and hold harmless Lessor, the Master Lessor and the United States for, from and against any and all losses, claims, costs, fees, expenses, suits, damages, attorneys' fees, judgments, actions, investigation costs, remediation costs, consulting fees, proceedings and liabilities to the extent arising during the Term of this Lease out of or from or in connection with:

**(i)** any breach by Lessee of any provisions of this **Section 15**;

22

(ii)     arising out of the use, handling, treatment, removal, generation, storage, release, discharge, disposal or transportation of Hazardous Materials by Lessee or its agents, contractors, employees, or licensees;

(iii)     any release, threatened release, or disposal of any Hazardous Material at or from the Leased Premises or Carousel/Looper by Lessee or its agents, contractors, employees, or licensees; or

(iv)     the violation of any Environmental Law or Hazardous Materials Law at the Leased Premises or Carousel/Looper by Lessee or its agents, contractors, employees, or licensees.

(b)     **Persons Bound**.  The indemnification shall be binding upon the successors and assigns of Lessee with respect to their periods of ownership and control and to the benefit of Lessor, the Master Lessor and the Secretary, and their directors, officers, employees and agents, and their successors and assigns.

**15.7     Entry and Inspection**.  Lessor, the Master Lessor, the Secretary and their agents, employees and contractors, shall have the right, but not the obligation, to enter the Leased Premises at all reasonable times, upon not less than forty-eight (48) hours advance notice, to inspect Leased Premises and Lessee's compliance with the terms and conditions of this **Section 15**.  The foregoing notwithstanding, Lessor, the Master Lessor, the Secretary and their agents, employees and contractors shall have the right to inspect the areas of the Leased Premises that are open to the public at any time without prior notice.  Any such entry shall be conducted in a manner that minimizes disruption of Lessee's business and other permitted activities on the Leased Premises.  Lessor, the Master Lessor and the Secretary shall have the right to enter and inspect the Leased Premises without notice due to exigent circumstances and in such case the entering entity shall use reasonable efforts to notify a representative of Lessee of any such entry or planned entry as soon as reasonably possible.

**15.8     Default Under Environmental Provisions**.  Lessee's failure to comply with any provisions under this **Section 15** (not cured in accordance with the provisions of **Section 17.1** of this Lease) shall be a material default of this Lease which shall entitle Lessor or the Secretary to all available remedies under this Lease and otherwise.

**15.9     Survival of This Section**.  Lessee specifically agrees that the obligations of Lessee, and of any of its successors and assigns, under this section shall survive the expiration or termination of this Lease for a period of two (2) years.

**15.10     Pre-existing Conditions**.  Lessee shall not be held responsible or liable for any Pre-existing Conditions, as defined below, on the Leased Premises or conditions that migrate onto the Leased Premises from Lessor's other lands.  Pre-

23

existing Conditions shall mean a condition in existence on the Leased Premises prior to April 7, 1993. Lessor shall protect, indemnify, defend and hold harmless Lessee for, from and against any and all losses, claims, costs, fees, expenses, suits, damages, attorney's fees, judgments, actions, investigation costs, remediation costs, consulting fees, proceedings and liabilities to the extent arising or related to conditions existing on the Leased Premises prior to April 7, 1993 or migrating onto the Leased Premises from Lessor's other lands.

**15.11 Environmental Bond**. Lessee agrees to provide a corporate surety bond or other security in an amount and in a form satisfactory to Lessor, in order to guarantee that Lessee will comply with its obligations under this Lease to comply with the Environmental Laws. Such security shall remain in full force and effect for a period after the termination of this Lease until a letter has been received from DEQ, with the concurrence of Lessor and Master Lessor, stating that Lessee has complied with the provisions of this Lease relating to compliance with the Environmental Laws. Lessor, subject to the concurrence of Master Lessor, may waive the requirement of this bond, but may thereafter require Lessee to comply with this provision.

16. **Eminent Domain**.

**16.1 Allocation of Compensation for Taking**. All compensation and damages awarded for the taking of any portion of the Leased Premises, Carousel/Looper or improvements thereon or any portion thereof shall be awarded as the respective interest of the Master Lessor, Lessor, Lessee, any Sublessee and any Approved Encumbrancer appear at the time of the taking; provided, however, that the Master Lessor in no event shall be entitled to a portion of the award less than the sum it would receive if the Leased Premises were not subject to the Lease and improvements had not been placed thereon by the Community or Lessee or any Sublessee.

**16.2 Refund of Rent**. There shall be pro-rated refunds of Rent paid in advance or credits to Lessee's future rent, because of total or partial taking of the Leased Premises or the Carousel/Looper.

**16.3 Voluntary Conveyance a Taking**. A voluntary conveyance by the Community under threat of a taking under the power of eminent domain in lieu of formal proceedings shall be deemed a taking within the meaning of this **Section 16**.

**16.4 Total Taking Terminates Lease**. In the event that all of the Leased Premises are taken, this Lease shall terminate as of the date of taking.

**16.5 Partial Taking**. In the event a portion, but not all, of the Leased Premises or Carousel/Looper is taken, the Rent shall abate accordingly. In the event that the portion of the Leased Premises taken is so substantial as to render the balance of the Leased Premises unusable for the purpose set forth in this Lease, the Lessee shall have the option to terminate this Lease. Nothing herein shall prohibit Lessee

24

from making claim, in its own name, to the condemnation authorities for the value of any furnishing, trade fixtures, equipment, merchandise or personal property of any kind belonging to Lessee and not forming part of the real property, or for the cost of moving same, and for damages for interruption of Lessee's business.

17. **Default**.

**17.1    Lessee Default**.   The occurrence of any one or more of the following events will constitute an event of default on the part of Lessee:  (i) should Lessee default in any payment of monies or fail to post any bond as required by the terms of this Lease, and if such default shall continue uncured for the period of five (5) days after written notice (as provided in **Section 39**) of such default is delivered to Lessee; (ii) should Lessee breach any other covenant of this Lease, and if the breach of such other covenant shall continue uncured for a period of thirty (30) days (or if such breach of such other covenant cannot reasonably be cured within thirty (30) days, Lessee shall have a reasonable time to cure such breach provided that Lessee proceeds in good faith and with due diligence) after written notice (as provided in **Section 39**) of such default is delivered to Lessee; (iii) appointment of a receiver to take possession of the Leased Premises or of Lessee's operations for any reason if not discharged within ninety (90) days of such appointment; or (iv) an assignment for the benefit of creditors or the filing of a voluntary or involuntary petition by or against Lessee under any law for the purpose of adjudicating Lessee as bankrupt; or for extending time for payment, adjustment or satisfaction of Lessee's liabilities to creditors generally; or for reorganization, dissolution, or arrangement on account of or to prevent bankruptcy or insolvency; unless the assignment or proceeding, and consequent orders, adjudications, custodies, and supervisions are dismissed, vacated or otherwise permanently stayed or terminated within ninety (90) days after the assignment, filing or other initial event.

Upon a default by Lessee, Lessor may, in its sole and absolute discretion, exercise any one or more of the following remedies concurrently or in succession:

(1)    Collect by suit or otherwise damages and all monies as they become due hereunder, or enforce, by suit or otherwise, Lessee's compliance with any provisions of this Agreement.

(2)    Terminate this Lease, or terminate Lessee's right to possession of the Leased Premises, and retake exclusive possession of the Leased Premises enter the Leased Premises, and remove all persons and property therefrom without being deemed guilty of trespass or becoming liable for any loss or damage that may be occasioned thereby.

(3)    Re-let the Leased Premises without terminating this Lease, as the agent and for the account of Lessee, but without prejudice to the right to terminate this Lease thereafter, and without invalidating any right of Lessor or any obligations of Lessee hereunder.  Terms

25

and conditions of such re-letting shall be at the discretion of Lessor who shall have the right to alter and repair the Leased Premises as it deems advisable, and to re-let with or without any equipment or fixtures situated thereon. Rents from any such re-letting shall be applied first to the expenses of re-letting, collecting, altering and repairing, including attorneys' fees and any real estate commission actually paid, insurance, taxes and assessments and thereafter toward the payment to liquidate the total due under this Lease. Lessee shall pay to Lessor monthly, when due, any deficiency, and Lessor may sue thereafter as each monthly deficiency shall arise.

(4)     Enforce the statutory landlord's lien on Lessee's property.

(5)     Accelerate all Rent and other payments due under this Lease, and to collect such sums by suit or otherwise.

(6)     Collect any rent or other consideration to be paid by a sublessee, assignee, or transferee of Lessee pursuant to a sublease, assignment, or transfer of this Lease, including amounts past due and unpaid, and apply the same against unpaid Rent or other amounts due under this Lease, or against any other costs to Lessor associated with Lessee's default.

(7)     Take any other action deemed necessary to protect any interest of Lessor or Master Lessor or pursue all other remedies available at law or in equity.

(8)     Invoke the provisions of 25 CFR Part 162 relating to cancellation of leases.

**17.2     Lessor Default**.     If Lessor fails to perform any of the covenants, provisions or conditions in this Lease to be performed by Lessor, and if such failure continues for thirty (30) days after Lessor receives written notice of default (or if more than thirty (30) days is required because of the nature of the default, if Lessor fails to commence the curing of such default within the thirty (30) Day period and fails to proceed diligently to completion), then Lessor shall be responsible to Lessee for any actual damages sustained by Lessee as a result of Lessor's breach, but not special or consequential damages. Lessee shall have no right to terminate this Agreement, except as expressly provided elsewhere in this Agreement.

**18.     Dispute Resolution**.

**18.1     Limited Waiver of Sovereign Immunity**. The Lessor hereby waives its sovereign immunity solely for the limited purpose of (a) commencing arbitration, (b) enforcing arbitration and (c) enforcing arbitration decisions or awards in accordance with the dispute resolution provisions herein, and solely to Lessee. This limited waiver of sovereign immunity does not extend to (i) any person or

26

entity other than the Lessee, or (ii) any claims for consequential or punitive damages. The provisions of this **Section 18.1** shall remain in full force and effect and shall not be affected by any alleged or actual breach or default under this Lease, an Approved Encumbrance, any related agreement, exhibit, document, or undertaking or any amendments, modifications, extensions or renewals thereof.

**18.2    Federal Arbitration Act in Accordance with AAA Rules**.

    **(a)    Dispute**.  Any controversy or claim arising out of this Lease or any amendment, modification, extension or renewal thereof, or its breach (the "Dispute"), will be settled by binding arbitration in accordance with Public Law 107-159 (April 4, 2002), 116 Stat 122, as amended by Public Law 109-147 (April 22, 2005), 119 Stat 2679, codified at 25 U.S.C. § 415(f), pursuant to United States Arbitration Act, 9 U.S.C. § 1, *et seq.* ("Title 9"), and in accordance with this **Section 18.2(a)**. Any (a) refusal to submit to arbitration, (b) exercise of a right under Title 9, or (c) enforcement of an arbitration award or decision under this **Section 18.2(a)** is solely within the jurisdiction of the United States District Court, District of Arizona (the "District Court"). An arbitration award under this **Section 18.2(a)** is final unless a party files a motion to vacate or modify the award pursuant to 9 U.S.C. § 12 in the District Court within thirty (30) days of the date of the award.  Judgment upon the award under this **Section 18.2(a)** may be confirmed in the United States District Court for the District of Arizona, pursuant to 25 U.S.C. § 415(f) and 9 U.S.C. § 9.

    **(b)    AAA Rules**.  Binding arbitration under **Section 18.2** will be conducted in accordance with the Commercial Dispute Resolution Procedures of the American Arbitration Association ("AAA Rules") as modified by this **Section 18.2**. The AAA Rules are modified as follows:

        **(i)**    The arbitrators must render their award in strict conformity with the modified AAA Rules and have no power to depart from or change any of provisions of this Lease or the modified AAA Rules.

        **(ii)**    The arbitrator's power, jurisdiction, decisions and award allowed under the AAA Rules are limited by **Sections 18.2**.

        **(iii)**    Any consent to jurisdiction under the AAA Rules is limited to the District Court and excludes jurisdiction in any state court; and

        **(iv)**    The arbitration hearing will be conducted in Phoenix, Arizona, before three (3) arbitrators. Each party shall select an arbitrator.  The two (2) arbitrators selected by the parties shall discuss and select the third arbitrator.  Unless the parties agree otherwise, at least two (2) of the selected arbitrators shall be attorneys or retired judges knowledgeable about

27

federal Indian law and jurisdiction within Indian country. In the alternative, the parties may mutually agree in writing to submit the Dispute(s) for consideration by a single arbitrator that is mutually agreed upon by the parties.

**18.3    Emergency Remedies**. The parties acknowledge that binding arbitration is the dispute resolution mechanism chosen by the parties. At the same time, the parties understand that situations may arise where the need for immediate relief precludes the use of arbitration. Thus, in an emergency situation, a party may pursue an emergency remedy in the Community Court. For purposes of this **Section 18.3**, an "emergency situation" includes (i) a situation where there is reasonable probability of environmental harm to the Leased Premises or surrounding areas if a party were to wait for arbitrators to act, (ii) a situation where personal property might be removed from the Leased Premises prior to the time a party could request relief from the arbitrators, (iii) a situation where there is a reasonable chance of harm to the public health or safety if a party were to wait for arbitrators to act, or (iv) any other situation in which a party reasonably believes that an emergency remedy is necessary to protect that party's material rights. For purposes of this **Section 18.3**, "emergency relief" includes a temporary restraining order, preliminary injunction or any other provisional remedy in which time is of the essence and speedy action is necessary to protect a party's material rights. The institution and maintenance of an emergency remedy shall not constitute a waiver of the right or elimination of the requirement to submit disputes to arbitration. Even if a party invokes an emergency remedy, the parties intend that the involvement of the Community Court will be limited to those actions necessary to address the emergency situation and that, to the extent possible, the dispute will be resolved by arbitration. By way of illustration of the preceding sentence, assume that Lessee was improperly disposing of hazardous waste on the Leased Premises; Lessor could obtain temporary injunctive relief to stop the improper disposal, but any action to determine damages would be resolved by arbitration.

19.    **Governing Law**. This Lease shall be governed by the Gila River Indian Community Code and any action, special proceeding or other proceeding that may arise from, in connection with or by reason of this Lease shall be resolved pursuant to the Gila River Indian Community Code and in the Gila River Indian Community Courts, except as provided in **Section 18.2** herein. If there is no applicable Community or federal law, the arbitrators shall be guided by the laws of the State of Arizona. Notwithstanding the provisions of this **Section 19**, Arizona law may govern any sublease, Approved Encumbrance, contract, transaction or other legal relationship or undertaking between the Lessee and any third party that is not the Community, or a member, employee, agent, representative, enterprise, subdivision or affiliate of the Community.

20.    **General Limitations**.

**20.1     No Interest in Real Property**.  Lessee shall not under any circumstances hold or be entitled to any interest in any real property of Lessor, other than Lessee's ground leasehold interest and any easements granted under this Lease.

**20.2     No Waiver of Lessor's and Master Lessor's Sovereign Immunity**. Except as set forth in **Section 18.1**, nothing in this Lease, or in any related agreement, exhibit, document or undertaking, or any amendments, modifications, extensions or renewals thereof, shall be construed as modifying, diminishing, qualifying or otherwise impairing the sovereign immunity of Lessor. Nothing in this Lease, or in any related agreement, exhibit, document or undertaking, or any amendments, modifications, extensions or renewals thereof, shall be construed as modifying, diminishing, qualifying or otherwise impairing the sovereign immunity of Master Lessor.

**20.3     No Consent to Jurisdiction**.  Except as set forth in **Sections 18.1 and 18.2**, nothing in this Lease, or in any related agreement, exhibit, document or undertaking, or any amendments, modifications, extensions or renewals thereof, shall be construed as a waiver of the sovereign immunity of the Lessor or as consent by Lessor to the jurisdiction of any state or municipal court.  Nothing in this Lease, or in any related agreement, exhibit, document or undertaking, or any amendments, modifications, extensions or renewals thereof, shall be construed as a waiver of the sovereign immunity of the Master Lessor or as consent by Master Lessor to the jurisdiction of any state or municipal court.

**21.     Employment Preference**.  Lessee shall comply with the applicable provisions of Title 12 of the Community's Law and Order Code.  As required by the Chapter 5 of Title 12 of the Community's Law and Order Code, the Lessee shall give a hiring preference to Community members and individual Indians for all positions of employment with Lessee for which they qualify.  Lessee shall give a preference to qualified Community members and individual Indians in promotions, training, and all other aspects of employment, contracting, and subcontracting.

**22.     Holding Over**.  Holding over by Lessee after the termination or expiration of this Lease shall not constitute a renewal or extension of this Lease or give Lessee any rights hereunder in or to the Leased Premises.  Lessee agrees to remove all Removable Personal Property of Lessee prior to the termination or expiration of this Lease.  Should Lessee fail to remove any of Lessee's Removable Personal Property within the specified time, Lessor shall have the right to remove it and dispose of it or have it stored, all at Lessee's expense. In the event of a holding over by Lessee or failure to remove any Removable Personal Property prior to the termination or expiration of this Lease, the monthly Rent amount shall be increased for the first two (2) months of such holdover to an amount equal to one hundred twenty-five percent (125%) of the monthly Rent amount payable during the last month of the Lease Term, and thereafter the monthly Rent amount shall be increased to an amount equal to one hundred fifty percent (150%) of the monthly Rent amount payable during the last month of the Lease Term, and any other sums due under this Lease shall be payable in the amounts and at the times specified in this Lease.

29

Lessee shall not have any duty to remove or cause removal of any Removable Personal Property of a Sublessee whose Sublease is to continue in effect as provided in **Section 12.**

23. **No Partnership**. Lessee and Lessor are not in partnership.

24. **Termination of Federal Trust**. Nothing contained in this Lease shall operate to delay or prevent a termination of federal trust responsibilities with respect to the Leased Premises by the issuance of a fee patent or otherwise during the Lease Term; provided, however, that such termination shall not serve to abrogate this Lease. Master Lessor, Lessor, Lessee and any surety or sureties of Lessee, and Approved Encumbrancers shall be notified of any such change in the status of the Leased Premises.

25. **Lessee's Obligations to the United States**. While the Leased Premises are held in trust by the United States or subject to a restriction against alienation imposed by the United States, all of Lessee's obligations under this Lease, and the obligations of any sureties of Lessee, are to the United States as well as to Lessor and Master Lessor. Lessor consents to the exercise of remedies available under Arizona law as between Lessee and any Sublessee and/or any Approved Encumbrancer. Lessee agrees to refrain from entering into any transactions or engaging in any other actions that involve encumbrance of, liens on, deeds of trust on or other legal attachment of Indian real property held in trust. Nothing in this **Section 25** or this Lease, or in any related document or undertaking, shall be construed as waiving, diminishing, impairing, qualifying or otherwise limiting the operation and application of federal law, policy and regulations with respect to Indian trust lands, including legal limitations on the encumbrance of, liens on, deeds of trust on or other legal attachment of Indian real property held in trust.

26. **Inspection**. The Secretary, the Master Lessor, Lessor, and their authorized representatives shall have the right, at any reasonable times during the Lease Term, upon not less than forty-eight (48) hours advance notice (except in emergencies), to enter upon the Leased Premises, or any part thereof, in order to inspect the same and all buildings and other improvements erected and placed thereon. Any such inspection shall be performed in a manner so as to minimize any interference with the use and occupancy of the Leased Premises by Lessee and any Sublessees.

27. **Closure Bond; Delivery of Leased Premises**.

27.1 **Closure Bond**. No later than twelve (12) months prior to the expiration of this Lease, Lessee shall post with the Secretary a bond (the "**Closure Bond**") in a form reasonably satisfactory to the Lessor in a penal sum of Three Hundred Twenty-Five Thousand Dollars ($325,000.00) which bond shall be deposited with the Secretary. Should the Lessee fail to post the Closure Bond within the specified period, or thereafter fail to maintain the Closure Bond, which failure is not remedied in accordance with the provisions of **Section 17**, Lessee shall be deemed to be in default. Lessee shall obtain and deposit with the Secretary a bond or security in the form set forth in 25 CFR §162.435(a) in the appropriate amount set forth herein, together with a power of attorney, empowering the Secretary, in the event of Lessee's failure to perform its obligations under **Section**

30

**27.3** to dispose of any such bonds or other security and pay over the proceeds derived therefrom to the Lessor to cover all costs associated with: (i) the removal of any or all buildings and improvements on the Leased Premises at the expiration or termination of the Lease, and (ii) Lessee's obligations under **Section 27.3**.

**27.2** **Lessee's Liability**. Lessee's liability under **Section 27.3** below is limited to the amount of the Closure Bond set forth in **Section 27.1** above. Lessee's obligation to remove buildings or improvements on the Leased Premises at the termination of the Lease shall be capped at the amount of the Closure Bond. This cap on Lessee's liability under this **Section 27.2** has no effect on Lessee's obligations under **Section 15.3(f)** regarding Hazardous Materials removal and clean-up.

**27.3** **Delivery of Leased Premises**. At the termination or expiration of this Lease and at no charge to Lessor, Lessee will peaceably and without legal process deliver up the possession of the Leased Premises, in good condition, usual wear and tear and damage by casualty or condemnation excepted. Lessor shall have the right to require Lessee to remove any or all of the buildings or improvements on the Leased Premises at the termination of the Lease. If Lessee is so notified by Lessor, Lessee at Lessee's sole cost and expense, shall remove said buildings or improvements within six (6) months after termination or expiration of the Lease, and shall restore that portion of the Leased Premises as nearly as possible to the condition existing on April 7, 1993. In the event that Lessee fails to remove said buildings and improvements as required, Lessor may use the Closure Bond to pay the costs of any demolition or renovation of the Leased Premises. Notwithstanding anything in this Lease to the contrary, Lessor may exercise all rights and remedies available to Lessor in law and/or in equity to secure performance by and compliance of Lessee. If requested in writing by Lessor, Lessee shall execute and deliver quitclaim conveyance documents conveying Lessee's right, title and interest in and to any Lessee Improvements and any Removable Personal Property left at the Leased Premises as of the expiration or earlier termination of this Lease.

**28.** **Lease Binding**. This Lease and the covenants, conditions and restrictions hereof shall extend to and be binding upon the successors, heirs, assigns, executors and administrators of the parties hereto.

**29.** **Tax Immunity**. Nothing contained in this Lease shall be deemed to constitute a waiver of applicable laws providing tax immunity to trust or restricted Indian property or any interest therein or income therefrom.

**30.** **Interest of Member of Congress**. No member of, or delegate to Congress, or Resident Commissioner, shall be admitted to any share or part of this Lease or to any benefit that may arise herefrom, but this provision shall not be construed to extend to this Lease if made with a corporation or company for its general benefit.

**31.** **Force Majeure**. Whenever under this Lease there is a time period stated for performance of an obligation of Lessor or Lessee or for the occurrence of an event which

31

affects Lessor's or Lessee's rights or obligations under this Lease, and if during such period (i) a general or sympathetic strike or lockout; war, war-like actions or rebellion; acts of the public enemy; civil disturbances; earthquakes; explosions; or some other event occurs or fails to occur which is beyond the power to control of the party claiming the occurrence of such event, or (ii) Lessee is unable, despite the exercise of reasonable and diligent efforts, to obtain any Required Consent, and as a result of an event described in clauses (i) or (ii) above, Lessor or Lessee, as applicable, is delayed in effecting such performance, or occurrence of such event is delayed, then the period of delay so caused shall be added to the period allowed for the relevant performance or occurrence.

**32.**     **Validity of Lease and Amendments**.  This Lease shall not be valid or binding upon either party hereto until approved by the Secretary.  Any modifications of or amendments to this Lease shall be valid only if made in a writing approved by the Lessor. Further, the Secretary shall be deemed to have consented to an amendment to the Lease, if the Secretary has not objected in writing to the amendment within thirty (30) days following receipt of the amendment by the Secretary and the Lessee and Lessor have complied with the requirements of 25 CFR §162.446(c).

**33.**     **Severability**.  If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent be invalid or unenforceable, (except those which would substantially alter Lessee's monetary obligations hereunder or which would diminish Lessee's obligations to develop the Leased Premises in accordance with this Lease), the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby.  Each term and provision of this Lease shall be valid and enforced to the fullest extent permitted by law.

**34.**     **Multiple Counterparts**.  This Lease may be executed in any number of counterparts, and when so executed, all such counterparts shall constitute a single instrument binding upon all parties hereto notwithstanding the fact that all parties are not a signatory to the original or to the same counterpart.  The parties hereto agree that the signature pages from one or more counterparts may be removed from such counterparts and such signature pages may be attached to a single instrument so that the signatures of all parties may be physically attached to a single counterpart of this Lease.

**35.**     **Confidentiality**.     Lessee, Lessor and Secretary mutually agree to hold confidential the information supplied by either party to the other or to the Secretary pursuant to the terms of this Lease and any other documents or information which are so supplied which are reasonably deemed by either party to contain or constitute trade secret or proprietary information and which are designated as such.

**36.**     **Short Form of Lease**.  A Short Form of Lease for purposes of recordation may be executed by Lessee and Lessor and be filed in the appropriate records offices for the purpose of providing notice of the existence of this Lease.  A Short Form of Lease for such purpose shall contain only such information as is required for recordation and as to such information shall accurately restate the comparable information set out in this Lease. A Short Form of Lease shall not amend or change the effect of this Lease.

**37.** **Time of the Essence**. Time is of the essence under this Lease.

**38.** **Laws and Ordinances of the Community**. To the extent not in conflict with federal law, Lessee shall abide by, and shall cause its employees and agents to abide by, all Legal Requirements of the Community now in force and effect, or those that may be hereafter in force and effect.

**39.** **Notices; Payments; Demands**. Except for payments to Lessor, all notices, payments and demands shall be sent to the parties hereto at the address herein recited or to such addresses as the parties may hereafter designate in writing:

    **39.1** **For Lessor**:

Sun Valley Marina Development Corporation
20000 S. Maricopa Road
Chandler, Arizona 85226
Attn: General Manager

with a copy to:

Wild Horse Pass Development Authority
Attention: Dale Gutenson
5350 N. 48th St., Suite 210
Chandler, AZ 85226

with a copy to:

Rothstein Donatelli LLP
Attention: Denten Robinson
80 E. Rio Salado Parkway, Suite 710
Tempe, Arizona 85281

    **39.2** **For Master Lessor**:

Governor
Gila River Indian Community
525 West Gu u Ki
Post Office Box 97
Sacaton, Arizona 85147

with a copy to:

Gila River Indian Community Office of General Counsel
Attention: General Counsel
525 West Gu u Ki
Post Office Box 97
Sacaton, Arizona 85147

33

with a copy to:

Gila River Indian Community
Attention: Treasurer
525 West Gu u Ki
Post Office Box 2160
Sacaton, Arizona 85147

**39.3** **For Lessee**:

Bob Bondurant School of High Performance Driving
20000 S. Maricopa Road, Gate 3
Chandler, Arizona 85226
Attn: Jason Bondurant

With a copy to:

Quarles & Brady, LLP
Attention: Luis Ochoa
One South Church Avenue
Suite 1700
Tucson, Arizona 85701-1621

**39.4** **For Secretary**:

Superintendent, Pima Agency
Bureau of Indian Affairs
Box 8
Sacaton, Arizona 85147

**39.5** **Delivery and Service**. Notices, demands and payments shall be delivered in person or sent by certified or registered mail, return receipt requested. Service of any notice or demand shall be deemed completed seventy-two (72) hours after deposit in the mail or on the date actually received, whichever occurs first. Contact identities and addresses may be changed from time to time by providing notice as indicated in this **Section 39**. Payments to Lessor shall be made as provided in **Section 5.3(a)**.

**40.** **Waiver**. No waiver of by a party of any of its rights or of any default of the other party's obligations under this Lease, or of any provision of this Lease, shall be effective unless made in writing signed by the waiving party. Neither any such waiver by a party nor any failure of a party to insist on strict performance under this Lease by the other party will affect the right of such party thereafter to enforce such provision or to exercise any right or remedy in the event of any default of the other party, whether or not similar.

**41.** **Requests for Records and Reports**. Upon the request of Lessor, the Master Lessor or the Secretary, the Lessee agrees to cooperate and provide to Lessor or the Secretary, as applicable, copies of records, reports or information required by or directly

34

related to this Lease. Failure to comply with this **Section 41** may constitute a violation of this Lease.

42. **Groundwater Use Agreement**. Prior to the utilization of any groundwater from pumps located on the Leased Premises or within the Gila River Indian Reservation, Lessee shall enter into an agreement with the Gila River Indian Community Department of Public Works. Such agreement shall determine the amount of groundwater to be used by the Lessee, the rates charged for the use of such groundwater, any liabilities and penalties that may be charged for a violation of such agreement or for Lessee's failure to pay the costs associated with the delivery of such groundwater to the Leased Premises. The Groundwater Use Agreement shall also set forth the parties respective responsibilities regarding the operation, maintenance and repair of the groundwater pumps and associated delivery facilities. The Groundwater Use Agreement shall stand on its own merit and is not part of the consideration for this Lease. If the Lessee fails to execute a Groundwater Use Agreement within thirty (30) days from the date that this Lease is approved by the Secretary, then Lessee shall be in material default of this Lease. Such default shall entitle Lessor or the Secretary to all available remedies under this Lease and otherwise. A violation of the terms of the Groundwater Use Agreement by Lessee shall be considered a violation of this Lease.

43. **Condition of Leased Premises.** Lessee acknowledges and agrees that (i) it has had an opportunity to inspect the Leased Premises and investigate all matters relevant to Lessee's proposed use of the Leased Premises, (ii) except as expressly set forth herein, Lessor has not made any representations regarding the condition of the Leased Premises or Lessee's proposed use of the Leased Premises, and Lessee is entering into this Lease in reliance solely and exclusively upon its own independent investigations, and (iii) Lessee accepts the Leased Premises, including any existing improvements, "as is."

44. **Wild Horse Pass Motorsports Park Track Rentals**. During the Term of the Lease, Lessee may, pursuant to a separate track rental agreement, rent for its own use other tracks owned and operated by Lessor which are located at the Wild Horse Pass Motorsports Park, such tracks include, but are not limited to, the East Track and the Drag-strip Track (collectively "Lessor Tracks"). Lessee may rent the Lessor Tracks pursuant to this **Section 44** for limited events and uses permitted in **Section 4** of this Lease and other related activities as may be approved by Lessor at the then current rental fees, subject to change from time to time to account for changes in the market and the commercial rates being charged by Lessor to all parties renting tracks at the Wild Horse Pass Motorsports Park. The rental of any of the Lessor Tracks is subject to Lessor's other scheduled events for use of such tracks. The Lessee's rental and use of any of the Lessor Tracks shall include the track and associated area as depicted on **Exhibit H** attached hereto and incorporated herein by reference.

45. **Accounting and Audits**. Any duly authorized representative of Lessor or the Master Lessor, or any qualified accounting agent or agents appointed by Lessor or the Master Lessor, shall have reasonable access to, and the right to examine and audit, any or all pertinent books, documents, papers and records, including state and federal income and sales tax returns, of Lessee related to the Leased Premises and the Carousel/Looper,

during the normal business hours of any working day. In the event that Lessor or the Master Lessor should cause to be conducted an audit of Lessee's pertinent books, documents, papers and records, and if such audit reveals that the Lessor has been paid less than ninety percent (90%) of all sums due under the provisions of this Lease to which the Lessor is entitled for any reporting period covered by the audit, then the expense of such audit shall be borne by Lessee; otherwise, the expense of such audit shall be borne by the requesting party. If such audit reveals that the Lessor has been overpaid, Lessor shall immediately remit the amount of such overpayment to Lessee, as applicable.

**46.    Use of Lessor's Facilities and Lands.**  Pursuant to an executed use agreement with Lessor, Lessee may use facilities or lands held by Lessor subject to the terms and conditions of such use agreement. Such use agreement shall require Lessee to indemnify, defend and hold harmless Lessor, Master Lessor, and the Secretary for, from and against all claims, suits, damages or the like that may arise out of the Lessee's use, or rental to third parties, of the Lessor's facilities and land. Lessee shall be responsible to carry the required insurance associated with Lessee's use of Lessor's facilities and lands. Lessor and Master Lessor shall be named as an additional insured party on such insurance policy.

**47.    West Track.**  Lessee shall have exclusive use of the West Track as set forth under **Section 4**, except that Lessor reserves use of the West Track, with a daily credit to Lessee as set forth in **Section 5.1**, for the following events already scheduled by Lessor:

    **(a)** Feb 11: West Track - Drift event open to Spectators
    **(b)** Feb 27-March 3: West Pad - Truck Rodeo
    **(c)** March 3-6: West Track/West Pad - Safe Driving Program
    **(d)** March 13-24: West Track/West Pad - Tire Testing
    **(e)** March 27-31: West Track - Rallycross Testing
    **(f)** June 16-18: West Track/West Pad - Drift event open to spectators
    **(g)** June 24: West Track/West Pad - Private Club Rental
    **(h)** September 9: West Track/West Pad - Private Club Rental
    **(i)** September 18-22: West Track/West Pad - Ride and Drive
    **(j)** October 7-8: West Track/West Pad - Private Club Rental
    **(k)** October 28: West Track/West Pad - Private Club Rental
    **(l)** November 18: West Pad - Music and Motorsports Show

**48.    Carousel/Looper.**  Lessee shall have non-exclusive use of the Carousel/Looper under the following conditions:

    **48.1**    Rent shall be paid as set forth under **Section 5.1**.

    **48.2**    Lessee's use of the Carousel/Looper shall be limited to the provision and operation of Lessee's driving schools and shall be coextensive with the Lease Term as defined in **Section 3**. All other uses of the Carousel/Looper by Lessee are strictly prohibited, unless approved in writing by Lessor.

36

**48.3** Lessee's use of the Carousel/Looper is subject to Lessor's scheduled events and usage of the Carousel/Looper. The parties shall meet on or before thirty (30) days prior to the beginning of a new month to discuss the schedule of the Carousel/Looper for the new month.

**48.4** Each party shall prepare, clean and maintain the Carousel/Looper for the days that each party uses the Carousel/Looper.

**48.5** Lessee shall be responsible for the general maintenance and upkeep of the Carousel/Looper, except for that portion of the Carousel/Looper that is a part of the Lessor's Drag Strip track, which Lessor shall be responsible for maintaining.

**48.6** Lessee accepts the Carousel/Looper, including any existing improvements, "as is." If Lessee desires to make any improvements to the Carousel/Looper, Lessee shall provide a plan that describes the type and location of the improvements to be constructed, a copy of the construction schedule (including dates for commencement and completion of construction) and budget for the project. Lessee must obtain Lessor's prior written approval for any improvements to the Carousel/Looper. The approval of any improvements to the Carousel/Looper is at Lessor's sole discretion and Lessor may determine, in its sole discretion, whether it will share in the costs of any approved improvements. Notwithstanding the foregoing sentence, if Lessor determines, in its sole discretion, that improvements are needed due to a safety issue then Lessor shall be responsible for such improvements to address the safety issue.

**49.** **Parking Rights.**

**49.1** In the event that Lessor requires the use of the area known as the "Skid Pad" located within the Leased Premises and as depicted on **Exhibit I** attached hereto, or portions thereof for vehicular parking during major events held at Wild Horse Pass Motorsports Park, Lessor's use of the Skid Pad shall not exceed ten (10) days within each Lease Year of the Term, provided Lessor (i) provides Lessee with forty-five (45) days prior written notice of the Days in which vehicular parking is needed; and (ii) pays Lessee a use fee for each day of such use of the Skid Pad by Lessor in an amount determined by the fraction, the numerator of which is the square footage of the Skid Pad, or portion thereof, and the denominator of which is the total rentable square footage of the Leased Premises multiplied by the daily Rent value of the Leased Premises, then in effect. For such purpose, the parties agree that as of the commencement of the Lease Term, the square footage of the Skid Pad is 375,085 square feet. The use fee shall be in the form of a credit and shall be applied to the next month's Leased Premises Rent payment made by Lessee. Following any use of the Skid Pad by the Lessor under this **Section 49**, the Lessor shall and at no charge to Lessee, clean and deliver the Skid Pad to Lessee, in as good of a condition as it existed

37

prior to the Lessor's use by no later than the start of the next Day following the term of Lessor's use thereof.

**49.2** Lessee shall not sell any parking space on its Leased Premises to third parties during an event at Wild Horse Pass Motorsports Park or benefit in any other manner from an event at the Wild Horse Pass Motorsports Park by using the Skid Pad or its Leased Premises without the express written permission of Lessor.

50. **Signage**.

**50.1** The parties agree to share the signage space on the existing overhead entryway located at Gate 3 of the Wild Horse Pass Motorsports Park as set forth herein and as depicted on **Exhibit J** attached hereto and incorporated by this reference ("Overhead Entryway"). Lessee shall have usage of one-third (1/3rd) of the signage space (front and back) located on the west side of the Overhead Entryway. The middle one-third (1/3rd) of the Overhead Entryway (front and back) shall be used as a non-branded common space for general welcome and goodbye messages which shall be designed by Lessor. The east one-third (1/3rd) of the Overhead Entryway (front and back) shall be used by Lessor. All Lessee designs and signage to be placed on the Overhead Entryway shall be approved in writing by Lessor prior to the Lessee signs or designs being placed on the Overhead Entryway. Such Lessor approval shall not be unreasonably denied, conditioned or delayed. Lessee shall not be required to pay any additional compensation to Lessor for the shared signage space as set forth in this **Section 50.1**. Lessee shall pay for all costs and expenses associated with its own designs, signs and installations associated with its signage under this **Section 50.1**. Notwithstanding the foregoing, Lessor reserves the right to use 100% of the signage space on the Overhead Entryway commencing five (5) days prior to the National Hot Rod Association National Event hosted each year by Lessor and ending five (5) days after such event officially ends.

**50.2** All Lessee designs and signage that Lessee may erect, post or install on the Leased Premises that are visible from Maricopa Road shall be approved in writing by Lessor prior to the Lessee designs or signs being erected, posted or installed. Such approval shall not be unreasonably denied, conditioned or delayed. Lessee shall pay for all costs and expenses associated with its own designs, signs and installations associated with its signage under this **Section 50.2**.

**50.3** All signage must comply with all applicable Community codes, ordinances, regulations and laws.

[Remainder of Page Intentionally Left Blank.]

38

**IN WITNESS WHEREOF,** Lessor and Lessee have executed this Lease as of the date first above written.

**LESSEE:**

**BOB BONDURANT SCHOOL OF HIGH PERFORMANCE DRIVING**

By: _Pat Bondurant_
Its: PRESIDENT
Dated: 3-2-17

**LESSOR:**

**SUN VALLEY MARINA DEVELOPMENT CORPORATION**

By: _____
Its: President
Dated: 3/3/2017

ALYSSA CHEYENNE BARNETT
Notary Public - Arizona
Maricopa County
My Comm. Expires Sep 11, 2018

_alyssa cheyenne Barnett_

**MASTER LESSOR:**

**GILA RIVER INDIAN COMMUNITY**

By: _____
Its: Governor
Dated: 3-15-17

**Approved as to form:**

By: _____
Its: General Counsel

Approved pursuant to the authority delegated to the Assistant Secretary of the Interior-Indian Affairs by 209 DM 8, to the Director of the BIA by 230 DM 1, to the Western Regional Director by 3 BIAM 4, and to the Superintendent by historic Phoenix Area Re-Delegation Documents in 10 BIAM.

Approved By: _____
Its: Superintendent, Pima Agency, Sacaton, Arizona
Dated: _____

39

# EXHIBIT A

**Leased Premises**

EXHIBIT A
LEGAL DESCRIPTION
Perimeter Lease Area

An Enclosed Lease area located within a portion of Section 8, Township 02 South, Range 04 East, G&SRM, Maricopa County, Arizona

COMMENCING at a 1" plastic cap on 1/2" rebar stamped 'LS 36562' being the South Quarter corner of Section 8 from said point a 3-1/4 inch Aluminum Cap in concrete stamped "Gila River Indian Community" "LS 28237" for the Southwest corner of said Section 8 bears North 89°58'59"East (the basis of bearings for this legal description) at a distance of 2,638.73 feet;

Thence North 05°09'39" East, a distance of 51.58 feet to the edge of the lease site enclosed area and the POINT OF BEGINNING;

Thence the following courses and distances describing said perimeter of the lease site enclosure area;
North 89°57'12" West, a distance of 1176.40 feet;
South 89°38'52" West, a distance of 58.71 feet;
North 15°39'16" East, a distance of 111.51 feet;
North 15°33'32" East, a distance of 2525.19 feet;
South 32°59'10" East, a distance of 1039.16 feet;
South 37°33'06" East, a distance of 3.13 feet;
North 57°52'47" East, a distance of 390.95 feet;
South 33°34'31" East, a distance of 90.31 feet;
South 53°10'47" West, a distance of 9.68 feet;
South 33°04'51" East, a distance of 1333.95 feet;
South 32°38'36" East, a distance of 59.66 feet;
South 74°02'56" East, a distance of 94.38 feet;
South 33°09'33" East, a distance of 323.95 feet;
South 33°04'16" East, a distance of 387.17 feet;
South 32°52'57" East, a distance of 5.16 feet;
South 89°57'15" West, a distance of 21.53 feet;
North 89°57'23" West, a distance of 320.03 feet;
North 89°59'10" West, a distance of 1313.99 feet to the POINT OF BEGINNING;

Containing 88.36 acres +/- (3,848,935 sq ft +/-)


Prepared by
David A. Rhine, RLS
George Cairo Engineering, Inc.        Expires 3-31-2016

## EXHIBIT B

**Parcel A**

