Hilary L. Barnes, #19669
Philip J. Giles, #30340
**ALLEN BARNES & JONES, PLC**
1850 N. Central Avenue, Suite 1150
Phoenix, Arizona 85004
Office: (602) 256-6000
Fax: (602) 252-4712
Email: hbarnes@allenbarneslaw.com
        pgiles@allenbarneslaw.com

Attorneys for the Debtor

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| Bob Bondurant School of High Performance Driving, Inc., | Case No. 2:18-bk-12041-BKM |
| Debtor. | **SUPPLEMENT TO MOTION TO APPROVE SALE OF ASSETS FREE AND CLEAR OF LIEN** |
| | Hearing (Auction) |
| | Date: March 22, 2019 |
| | Time: 10:00 a.m. |
| | Location: 230 First Avenue, Ctrm 701 Phoenix, AZ 85003 |

Bob Bondurant School of High Performance Driving, Inc., the debtor and debtor in possession (the "Debtor") in the above-captioned chapter 11 case (the "Case"), hereby supplements the *Motion to Approve Sale of Assets Free and Clear of Lien* [DE #179] ("Sale Motion") as follows:

1.      The sale ("Sale") contemplated in the Sale Motion includes the assignment and assumption of certain executory contracts and leases, with or without consent as may be required, pursuant to 11 U.S.C. § 365(f).  *See* Sale Motion, FN 4.  Accordingly, the prayer for relief in the Sale Motion is hereby supplemented to include Debtor's request for entry of an Order:

a. Authorizing the Debtor's assumption and assignment of such executory contracts and leases as may be required to facilitate the Sale or any sale transaction as may be approved by the Court at the auction scheduled for March 22, 2019;

b. Waiving the 14-day stay set forth in Bankruptcy Rules 6004(h) and 6006(d) with respect to such assumption and assignment; and

c. Granting such other and further relief as the Court deems just and proper under the circumstances of this Case.

2.    Notwithstanding anything contained in the Sale-related documents (including the Bid Procedures or Sale Motion, or the proposed APA or any subsequent APA), the FCA USA, LLC ("FCA") contracts, vehicles, or trademarked or licensed products (collectively the "FCA Interests") are *not* subject to either (i) sale or (ii) assumption and assignment to any proposed buyer. Any proposed buyer must enter into new agreements with FCA, at FCA's sole discretion, to obtain access to the FCA Interests.

3.    The Asset Purchase Agreement, Exhibit B to the Sale Motion and attached to the *Notice of Filing [...]* [DE #190] on March 14, 2019, is hereby replaced with the Asset Purchase Agreement ("APA") attached hereto as **Exhibit 1**. The APA, as revised in accordance with the Court's ruling at the March 14, 2019 hearing on Debtor's *Motion to Approve Bid Procedures for Sale of Assets* [*See* Minute Entry, DE #204], is the final APA negotiated by and between the Debtor and AZNY22, LLC, the Proposed Buyer as identified in the Bid Procedures (i.e. the stalking horse bidder).

Respectfully submitted

DATED: March 15, 2019.

**ALLEN BARNES & JONES, PLC**

/s/ *PJG #30340*
Hilary L. Barnes
Philip J. Giles
1850 N. Central Avenue, Suite 1150
Phoenix, Arizona 85004
*Attorneys for the Debtor*

**E-FILED** on March 15, 2019 with the
U.S. Bankruptcy Court and copies served
via ECF notice on all parties that have
appeared in the case.

**COPY** mailed same date via U.S. Mail to:

OFFICE OF THE UNITED STATES TRUSTEE
230 N. First Avenue, Suite 204
Phoenix, AZ 85003-1706

All parties listed on the
Master Mailing List

**COPY** emailed same date to:

Elizabeth C. Amorosi
OFFICE OF THE UNITED STATES TRUSTEE
230 N. First Avenue, Ste 204
Phoenix, AZ 85003-1706
Elizabeth.C.Amorosi@usdoj.gov

Warren J. Stapleton
OSBORN MALEDON
2929 N. Central Ave., Ste 2100
Phoenix, AZ 85012
wstapleton@omlaw.com
*Attorneys for Sun Valley Marina Development Corp.*

Michelle E. Shriro
SINGER & LEVICK, P.C.
16200 Addison Road, Suite 140
Addison, TX 75001
mshriro@singerlevick.com
*Attorneys for Moses Smith Racing LLC*

Thomas E. Littler
LITTLER, PC
341 W Secretariat Dr.
Phoenix, AZ 85284
telittler@gmail.com
*Attorneys for Semple Marchal Cooper PLC*

Christopher C. Simpson
STINSON LEONARD STREET LLP
1850 N. Central Ave., #2100
Phoenix, AZ 85004
Christopher.simpson@stinson.com
*Attorneys for FCA US LLC*

Sheryl L. Toby
DYKEMA GOSSETT PLLC
39577 Woodward Ave., #300
Bloomfield Hills, MI 48304
stoby@dykema.com
*Attorneys for FCA US LLC*

Larry O. Folks
FOLKS HESS KASS, PLLC
1850 North Central Ave., Suite 1140
Phoenix, AZ 85004
folks@folkshesskass.com
*Attorneys for JPMorgan Chase Bank, NA*

Leslie A. Berkoff
MORITT HOCK & HAMROFF LLP
400 Garden City Plaza
Garden City, NY 11530
lberkoff@moritthock.com
*Attorneys for Unifi Equipment Finance, Inc.*

Christopher R. Kaup
TIFFANY & BOSCO, P.A.
Seventh Floor, Camelback Esplanade II
2525 E. Camelback Rd.
Phoenix, AZ 85016
crk@tblaw.com
*Attorneys for Robert and Patricia C. Bondurant*

James E. Cross
THE CROSS LAW FIRM, P.L.C.
1850 N Central Ave., Suite 1150
Phoenix, AZ 85004
JCross@crosslawaz.com
*Attorneys for Arlington Street Investments*

Mark J. Giunta
Liz Nguyen
Law Office of Mark J. Giunta
531 E. Thomas Rd., Suite 200
Phoenix, AZ 85012
markgiunta@giuntalaw.com
liz@giuntalaw.com
*Attorneys for The Bancorp Bank*

Robert Lapowsky
Stevens & Lee
620 Freedom Business Center, Suite 200
King of Prussia, PA 19406
rl@stevenslee.com

Robert J. Miller
Khaled Tarazi
BRYAN CAVE LEIGHTON PAISNER LLP
Two N. Central Ave., Suite 2100
Phoenix, AZ 85004-4406
rjmiller@bclplaw.com
khaled.tarazi@bclplaw.com
*Attorneys for Wells Fargo Vendor Financial Services, LLC*

*/s/ Misty Vasquez*

# Exhibit 1

# ASSET PURCHASE AGREEMENT

## 1. Preamble.

This ASSET PURCHASE AGREEMENT is made this 14th day of March, 2019 (hereinafter the "Agreement"), by, between and among BOB BONDURANT SCHOOL OF HIGH PERFORMANCE DRIVING, INC., an Arizona corporation (hereinafter the "Seller") and AZNY22, LLC, an Arizona limited liability corporation, (hereinafter the "Buyer"). Seller and Buyer are each a "Party" or together, the "Parties".

## 2. Recitals.

WHEREAS, the Seller operates a high performance driving school in Chandler, AZ, and

WHEREAS, the Seller filed for Chapter 11 bankruptcy in the Bankruptcy Court for the District of Arizona (hereinafter the "Bankruptcy Court") on October 2, 2018, case number 2:18-bk-12041-BKM (hereinafter the "Bankruptcy Case"), and

WHEREAS, the Buyer desires to purchase the enumerated assets of the Seller free and clear of all liens, claims, and encumbrances, and the Seller desires to sell such assets free and clear of all liens, claims, and encumbrances, in accordance with Section 363(f) of the Bankruptcy Code; and

WHEREAS, subject to the Bankruptcy Court's approval, the Seller desires to sell, assign, and otherwise transfer to the Buyer, and the Buyer wishes to buy, the Acquired Assets (defined below) and assume the Assumed Liabilities (defined below) pursuant to Section 365 of the Bankruptcy Code.

NOW THEREFORE, in consideration of the above premises and the mutual promises, covenants, agreements, representations and warranties herein contained, the parties hereto agree as follows:

## 3. Definitions.

The following terms shall have the following meanings when used in this Agreement and each of the Exhibits or Disclosure Schedules to this Agreement:

3.01. "Acquired Assets" shall have the meaning set forth in Section 5, below.

3.02. "Affiliate" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934, as amended.

3.03. "Affiliated Group" means any affiliated group within the meaning of Code Section 1504(a) or any similar group defined under a similar provision of state, local or foreign law.

3.04. "Allocation Schedule" has the meaning set forth in Paragraph 13.03.

3.05. "Approval Order" means the order entered by the Bankruptcy Court in the Bankruptcy Case approving this Agreement and the sale and transfer of the Acquired Assets to the Buyer free and clear of all liens, claims, and encumbrances.

3.06. "Assigned Contracts" means those executory contracts identified in Disclosure Schedule 3.06, which the Seller shall seek to assume and assign to the Buyer or its designee, or which shall be assumed and assigned with consent of the counterparty pursuant to Section 365 of the Bankruptcy Code. At any time prior to the closing of the transaction, the Buyer may elect, in its sole discretion by providing written notice to the Seller, to change the designation of any contract or Lease identified in Disclosure Schedule 3.06 from "Assume" to "Reject", and such contract or Lease shall be excluded from the Assigned Contracts.

3.07. "Assumed Liabilities" shall be limited to the Liabilities described in Paragraph 4.02 and all amounts due or to become due under Assigned Contracts.

3.08. "Auction" has the meaning set forth in Paragraph 8.03.

3.09. "Bankruptcy Case" has the meaning set forth in the recitals above.

3.10. "Bankruptcy Court" has the meaning set forth in the recitals above.

3.11 "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

3.12. "Bid Deadline" means 2 business days prior to the Sale Hearing.

3.13. "Bid Procedures" has the meaning set forth in Paragraph 8.02.

3.14. "Bid Procedures Order" means the Bankruptcy Court Order approving the proposed Bid Procedures, including the Termination Fee.

3.15. "[Intentionally omitted.]

3.16. "Business" shall mean the business operations of the Seller, which includes all of the operations of the Seller and all Intellectual Property rights appurtenant thereto.

3.17. "Business Day" shall mean any day other than Saturday, Sunday or any day on which banks in New York City, New York are authorized or obligated to close.

3.18. "Buyer" has the meaning set forth in Section 1, above.

3.19. [Intentionally omitted.]

3.20. [Intentionally omitted.]

3.21. [Intentionally omitted.]

3.22. "Claims" means claims, suits, proceedings, causes of action, Liabilities, losses, damages, penalties, judgments, settlements, costs, expenses, fines, disbursements, demands, reasonable costs, fees and expenses of counsel, including in respect of investigation, interest, demands and

actions of any nature or any kind whatsoever, related only to the Acquired Assets. For clarity, no Chapter 5 causes of action will be transferred from Seller to Buyer, except that certain potential cause of action related to museum cars, to the extent that cause of action can be transferred.

3.23. "Closing" has the meaning set forth in Section 9 below.

3.24. "Closing Date" has the meaning set forth in Section 9 below.

3.25. "Code" means the Internal Revenue Code of 1986, as amended.

3.26. "Confidential Information" means any information concerning the Business, assets, Liabilities, and affairs of the Seller that is not generally available to the public.

3.27. "Contracts" means all of Seller's contracts identified on Disclosure Schedule 3.27.

3.28. "Customer Deposits" means all deposits by customers for goods or services at the Seller, after the Closing Date, including without limitation deposits, program deposits, rental deposits, deposits toward down payments and any other consumer cash deposits for which the Buyer will provide goods or services after the Closing.

3.29. "Deal Protection Provisions" shall mean the protections set forth in Paragraph 8.04, below.

3.30. [Intentionally omitted.]

3.31. [Intentionally omitted.]

3.32. [Intentionally omitted.]

3.33. [Intentionally omitted.]

3.34. "Environmental Laws" shall mean all applicable laws relating to pollution or protection of human health or the environment (including ambient air, water, surface water, groundwater, land surface, soil or subsurface) or natural resources, including applicable laws relating to the storage, transfer, transportation, investigation, cleanup, treatment, or use of, or release or threatened release into the environment of, any Hazardous Substances.

3.35. "Environmental Permits" means all Permits issued pursuant to Environmental Laws.

3.36. "Equipment" means all machinery, equipment, furniture, fixtures, furnishings, spare parts, leasehold improvements, artwork, desks, chairs, tables, computer and computer-related hardware and firmware, Telephone Equipment, cubicles and miscellaneous office furnishings and supplies, maintenance equipment, tools, signs and signage, cleaning supplies in unopened cases or bulk containers or packages, and all other tangible personal property.

3.37. "Excluded Assets" shall mean the assets listed in Section 7, below.

3.38. "Excluded Documents" means (a) the litigation files of the Seller or any document or writing subject to the attorney-client, attorney work product, or tax preparer's privilege, and (b) those documents related to the Excluded Assets.

3.39. "Final Order" shall mean an order of the Bankruptcy Court as to which (a) the time to appeal has expired and as to which no appeal, petition for certiorari, or other proceedings for reconsideration shall then be pending, or (b) in the event that an appeal, writ of certiorari, or reconsideration thereof has been sought, the effectiveness of such order of the Bankruptcy Court shall not have been stayed pending appeal or motion for reconsideration.

3.40. "GAAP" means United States generally accepted accounting principles as in effect from time to time, consistently applied.

3.41. "Governing Documents" means, with respect to any specified non-natural Person, such Person's certificate of incorporation, certificate of formation, by-laws, operating agreement, partnership agreement, declaration of trust, declaration of covenants and restrictions, development agreements, or other similar document.

3.42. "Governmental Authority" means any federal, tribal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

3.43. "Hazardous Substances" means any material, substance or waste defined or characterized as hazardous, toxic, a pollutant or a contaminant under Environmental Laws, including asbestos or any substance containing asbestos, polychlorinated biphenyls, lead paint, petroleum or petroleum products (including crude oil and any fraction thereof), radon, and mold, fungus, and microbial matters.

3.44. "Indebtedness" means with respect to any Party (i) all obligations of such Party for borrowed money, whether current or funded, secured or unsecured, (ii) all obligations of such Party for the deferred purchase price of any property or services (other than trade accounts payable arising in the ordinary course of the business of such Party from the purchase of supplies), (iii) all obligations of such Party created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Party (even though the rights and remedies of the seller or lender under such agreement in the event of a default may be limited to repossession or sale of such property), (iv) all obligations of such Party secured by a purchase money mortgage or other lien to secure all or part of the purchase price of property subject to such mortgage or lien, (v) all obligations under leases which should be, in accordance with GAAP, recorded as capital leases in respect of which such Party is liable as lessee, (vi) any obligation of such Party in respect of bankers' acceptances or letters of credit, (vii) any obligations secured by liens on property acquired by such Party, whether or not such obligations were assumed by such Party at the time of acquisition of such property, (viii) all obligations of a type referred to in clause (i), (ii), (iii), (iv), (v), (vi), or (vii) above which are directly or indirectly guaranteed by such Party or which it has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a credit against loss, and (ix) any refinancing of any of the foregoing obligations.

3.45. "Intellectual Property" means intellectual property and other similar proprietary rights, whether owned, registered or unregistered, consisting of: (a) trademarks, trade dress, service marks, certification marks, logos and trade names, and the goodwill associated with the foregoing; (b) all inventions (whether patentable or unpatentable and whether or not reduced to practice) and all improvements, (c) patents and patent applications, and any and all divisions, continuations, continuations-in-part, reissues, continuing patent applications, re-examinations, and extensions thereof, any counterparts claiming priority therefrom, utility models, patents of importation/confirmation, certificates of invention, certificates of registration, inventions, discoveries and improvements, whether or not patentable, and like rights; (d) writings and other works of authorship; (e) trade secrets, nonpublic and confidential business, technical and know-how information and rights to limit the use or disclosure thereof by any Person, including ideas, research and development, know how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals; (f) software, including without limitation data files, source code, object code, firmware, application programming interfaces, databases and other software-related specifications and documentation; (g) registered domain names and uniform resource locators; (h) all mask works and all applications, registrations and renewals thereof; (i) all other proprietary rights; and (g) claims, causes of action and defenses relating to the enforcement of any of the foregoing; in each case, including any registrations of, applications to register, and renewals and extensions of, any of the foregoing with or by any Governmental Authority in any jurisdiction. "Intellectual Property" does not include any trademarks or licenses owned by FCA USA, LLC under those certain contracts between the Seller and FCA USA, LLC.

3.47. "Leased Real Property" means all leasehold or subleasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures, or other interest in real property leased or subleased by the Seller, which lease or sublease is expressly identified as an Assigned Contract, which is set forth on Disclosure Schedule 3.47.

3.48. "Leases" means all leases, subleases, licenses, concessions and other agreements (written or oral), including all amendments, extensions, renewals, guaranties, and other agreements with respect thereto, pursuant to which the Seller holds any Leased Real Property, that are expressly identified as Assigned Contracts.

3.49. "Liability(ies)" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), including any liability for Taxes.

3.50. "Lien" means any mortgage, pledge, lien, encumbrance, charge, security interest, or other charge against or interest in property to secure payment of Indebtedness or performance of an obligation, other than a Permitted Encumbrance.

3.51. [Intentionally omitted.]

3.52. [Intentionally omitted.]

3.53. [Intentionally omitted.]

3.54. [Intentionally omitted.]

3.55. [Intentionally omitted.]

3.56. "Order" means any writ, judgment, decree, injunction or similar order of any Governmental Authority (whether preliminary or final).

3.57. "Ordinary Course of Business" means the Seller's ordinary course of the Business consistent with past custom and practice (including with respect to quantity and frequency).

3.58. "Outside Date" has the meaning set forth in Paragraph 15.01(b).

3.59. "Overbid" has the meaning set forth in Paragraph 8.04.

3.60. "Owned Real Property" means all real property owned by Seller as set forth on Disclosure Schedule 3.60.

3.61. "Owned Vehicles" means all vehicles and trailers owned by Seller, except for vehicles financed under the Bancorp Agreements (as defined in Disclosure Schedule 4.02(a)) in which The Bancorp Bank asserts a documented bona fide interest.

3.62. "Party(ies)" has the meaning set forth in Section 1 above.

3.63. "Permits" means any and all consents, approvals, registrations, and similar authorizations of any applicable governmental authorities, including without limitation any Federal, tribal, state, or local rules, laws or regulations relating to the Acquired Assets, the Assumed Liabilities, Real Property, or the Assigned Contracts.

3.64. "Permitted Encumbrances" means with respect to each parcel of Real Property: (a) real estate taxes, assessments and other governmental levies, fees, or charges imposed with respect to such Real Property that are not due and payable as of the Closing Date; (b) easements, covenants, conditions, restrictions, and other similar matters of record affecting title to such Real Property that do not or would not impair the use or occupancy of such Real Property in the operation of the Business as currently conducted thereon; and (c) all zoning, building codes and other land use laws regulating the use or occupancy of such Real Property or the activities conducted thereon which are imposed by any governmental authority having jurisdiction over such Real Property.

3.65. "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, any other business entity, or a governmental entity (or any department, agency, or political subdivision thereof).

3.66. [Intentionally omitted.]

3.67. [Intentionally omitted.]

3.68. "Purchase Price" means the sum of the cash to be paid at Closing as set forth in Section 4.01, and the Assumed Liabilities, excluding any amounts due and payable under Assigned Contracts after the Closing.

3.69. "Purchased Intellectual Property" means all Intellectual Property rights used at or in connection with the operation of the Business, including without limitation those identified on Disclosure Schedule 3.69, and specifically excluding all trademarks and licenses owned by FCA USA, LLC.

3.70. "Qualified Bidder" has the meaning set forth in Paragraph 8.04.

3.71. "Real Property" means each parcel of Owned Real Property and each leasehold interest in the Leased Real Property.

3.72. "Records" means all documents that are in the possession or control of the Seller that relate to the Business, including, without limitation, all merchandise, analysis reports, marketing reports, creative material, production records, engineering records, purchasing and sale records, accounting records, business plan, budgets, cost and pricing information, correspondence, prospective client information, records relating to customers or guests (including customer or guest lists, correspondence with customers or guests, related files and attendance histories, but excludes customer or guest financial information), records relating to vendors (including vendor lists, correspondence with vendors and records of purchases from vendors), mailing lists, e-mail address lists, recipient lists, construction and building records (including, without limitation, drawings, plans, floor plans and architectural drafting and renderings, whether related to finished construction, construction in process or undeveloped areas) and data and other records and files, wherever located (including, without limitation, any such records maintained in connection with any computer system) contracts, agreements, or financial data, related to the Business, except Excluded Documents.

3.73. [Intentionally omitted.]

3.74. [Intentionally omitted.]

3.75. [Intentionally omitted.]

3.76. [Intentionally omitted.]

3.77. "Sale Motion" has the meaning set forth in Paragraph 8.02.

3.78. "Securities Act" means the Securities Act of 1933, as amended.

3.79. [Intentionally omitted.]

3.80. [Intentionally omitted.]

3.81. "Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association, or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof or (ii) if a limited liability company, partnership, association, or other business entity (other than a corporation), a majority of the partnership or other similar ownership interests thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons own a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

3.82. [Intentionally omitted.]

3.83. "Tax" or "Taxes" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Code Section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person.

3.84. "Tax Return" means any return, declaration, report, Claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

3.85. "Telephone Equipment" means copiers, telephone lines and numbers, facsimile machines and other telecommunication equipment not secured by the Wells Fargo Agreements (as defined in Disclosure Schedule 4.02(a))

3.86. "Termination Fee" shall have the meaning set forth in Paragraph 8.04(e).

3.87. [Intentionally omitted.]

3.88. "Transaction" means the transactions contemplated by this Agreement to be consummated at the Closing, including, but not limited to, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities as provided for in this Agreement.

3.89. "Transaction Documents" means the documents, agreements, and instruments contemplated by this Agreement.

3.90. "Treasury Regulations" means the final, proposed, and temporary regulations promulgated under the Code, as such regulations may be amended from time to time.

3.91. [Intentionally omitted.]

## 4. Purchase Price; Assumed Liabilities.

4.01. Provided that all conditions to Closing set forth in Section 14.01 hereof have been satisfied or waived, the Buyer agrees to assume only the assigned Assumed Liabilities and to pay to the Seller at the Closing by delivery of cash payable by wire transfer or delivery of other immediately available funds $300,000.00 ("Purchase Price"). Except as to the Assumed Liabilities, the Buyer shall not become liable for any of the Seller's obligations or liabilities.

4.02. The following liabilities of the Seller shall be assumed by the Buyer at the Closing ("Assumed Liabilities"):
(a) The Assigned Contracts and the corresponding amounts due after the Closing Date to the parties to the Assigned Contracts. For the avoidance of doubt, contracts, leases, and other agreements specifically identified on Disclosure Schedule 4.02(a) shall not be assumed by the Buyer.
(b) Obligations to customers incurred prior to Closing in the Ordinary Course of Business to fulfill future classes, rentals, etc. for which no Customer Deposits have been received.
(c) Obligations to customers incurred prior to Closing in the Ordinary Course of Business to fulfill future classes, rentals, etc. for which Customer Deposits have been received, provided that if Customer Deposit liability shall exceed the higher of $250,000 or 33.33% of booked future revenue as of the Closing Date, the cash component of the Purchase Price shall be reduced by the excess amount.

## 5. Acquired Assets. The Seller shall transfer and convey the assets listed in Sections 5.01 through 5.13, inclusive, and the assets to be transferred to the Buyer at the Closing free and clear of all liens, Claims and encumbrances (the "Acquired Assets") are as follows:

5.01. Those assets listed in the Seller's Bankruptcy Filing, including any rights pertaining to any transactions recited therein.

5.02. Owned Vehicles.

5.03. [Intentionally omitted.]

5.04. [Intentionally omitted.]

5.05. The rights of the Seller to possession or use of any land, buildings, and Equipment related to use and operation of the Seller's business.

5.06. [Intentionally omitted.]

Case 2:18-bk-12041-BKM    Doc 206    Filed 03/15/19    Entered 03/15/19 16:45:21    Desc
Main Document        Page 15 of 40

5.07. Seller's rights under the Assigned Contracts, after assumption and assignment, with consent as necessary.

5.08. Those of the Seller's physical assets, including machinery, inventory, Equipment, computers, software, furniture and fixtures, including, but not limited to those physical assets identified in Disclosure Schedule 5.08.

5.09. Documents and Records in the Seller's possession directly related to the Acquired Assets; provided, however, that the Buyer shall make the documents and records available to the Seller upon reasonable request in order to allow the Seller to fulfill its duties as debtor in possession in the Bankruptcy Case and as provided in Section 13, below.

5.10. Those intangible assets related to the Business, including, but not limited to, purchaser and owner lists, marketing pipeline, purchaser and owner data, Purchased Intellectual Property, trademarks, trade names, copyrights, websites, telephone numbers, brand names, implied and/or explicit licenses from Robert Bondurant to use their name, signature, image, likeness, etc., in connection with the Business and any and all other intellectual property to the extent such can be transferred by law, ownership interest in or rights to operate in the Ordinary Course of Business.

5.11. Accounts receivable, notes receivable, and rights and Claims owned by the Debtor related thereto, excluding any funds held by third parties for the benefit of the Seller, such as merchant servicers.

5.12. Prepaid expenses, and refunds and deposits, except for prepaid insurance premiums, due and owing after the Closing Date.

5.13. Insurance claims or insurance proceeds for damages caused to or the replacement cost or repair cost of any Acquired Asset as set forth on Disclosure Schedule 5.13, except those Claims/proceeds otherwise due to another loss payee.

5.14. OEI Design Project, including all drawings, other documents, rights and interests related thereto.

**6.** [Intentionally omitted.]

**7. Excluded Assets.** Notwithstanding anything else contained in this Agreement, the following assets shall not constitute Acquired Assets and shall not be acquired by the Buyer:

7.01. All cash and cash equivalents.

7.02. The contracts rights, lease rights, and Seller's rights under those other agreements identified in Disclosure Schedule 4.02(a) above.

7.03. Equipment that may be secured and/or financed under a contract identified in Disclosure Schedule 4.02(a) that is not assumed by the Buyer.

7.04. All securities of the Seller or any other Seller affiliated entity.

## 8. Bankruptcy Proceedings.

8.01. This Agreement is entered into by all Parties with the express understanding that it is subject to approval of the Bankruptcy Court and all applicable provisions of the Bankruptcy Code and the Bankruptcy Rules.

8.02. The Seller filed a motion with the Bankruptcy Court (the "Sale Motion") seeking authority to consummate the transactions contemplated hereunder, including authority to convey and assign the Acquired Assets to the Buyer and to permit the assumption of the Assumed Liabilities by the Buyer and the assumption and assignment of the Assigned Contracts to Buyer pursuant to Sections 105, 363, and 365 of the Bankruptcy Code. The Seller also filed a motion seeking the Bankruptcy Court's approval of certain bid procedures, including the Deal Protection Provisions (as defined in Paragraph 8.04 below) and allowance and authorization of the Termination Fee to be paid as an administrative expense pursuant to section 503 of the Bankruptcy Code (the "Bid Procedures").

8.03. The Buyer is a "stalking horse" bidder under the Bid Procedures. If the Seller receives an Overbid (as defined in Paragraph 8.04 below) by the Bid Deadline, the Seller shall conduct an auction for the Acquired Assets and the Assumed Liabilities on the date specified in the Bid Procedures Order (the "Auction").

8.04. The Bid Procedures Order shall contain the following "Deal Protection Provisions":
(a) Any "Overbid" must contain terms and conditions that are more favorable to the Seller than the terms and conditions of this Agreement;
(b) Any Overbid must provide for aggregate cash consideration to the Seller of at least $400,000.00 and assumption of the same liabilities set forth in this Agreement;
(c) Any Overbid must be accompanied by (i) a $50,000 refundable earnest money deposit in certified funds; (ii) proof of the bidder's ability to consummate the transaction and to provide adequate assurance of financial ability and of future performance on all contracts and leases that the proposed bidder proposes to be assumed and assigned; and (iii) a clean and marked asset purchase agreement showing changes to this Agreement;
(d) A party submitting an Overbid complying with this Paragraph and with any other requirements contained in the Bid Procedures Order shall be deemed a "Qualified Bidder." Without need for further action, Buyer shall be deemed a Qualified Bidder;
(e) [Intentionally omitted.]
(f) At the Auction, each subsequent bid following the Overbid must be in increments of $25,000.00;
(g) If the Bankruptcy Court approves and the Seller consummates an alternative sale of the Acquired Assets to someone other than the Buyer, the Seller shall be obligated to pay Buyer a break-up or termination fee equal to $25,000.00 in immediately available funds prior to, and as a condition to Closing (the "Termination Fee"). In addition to the Termination Fee, the Seller shall also reimburse any out-of-pocket legal and due diligence costs of the Buyer for which Buyer provides reasonably adequate documentation of such expenses, not to exceed $25,000. The Termination Fee and such expenses shall be (i) an administrative superpriority claim under Section 503(b) and 507(a)(1) of the Bankruptcy Code and shall be paid out of the gross proceeds of any

alternate sale or transaction; and shall be a super priority claim in the nature of a 507(b) claim (ii) payable on the second business day following the date that an alternate transaction or sale closes; and

(h) At the Auction, the Termination Fee and expense reimbursement amounts shall be taken into account with each and every bid made by any Qualified Bidder.

## 9. Closing.

9.01. The closing of the transactions contemplated by this Agreement (the "Closing") shall take place on March 29, 2019, or on such other date that is no longer than 10 business days after March 29, 2019 (the "Closing Date"), unless otherwise agreed in writing by the Parties.

9.02. At the Closing, the Seller will deliver to the Buyer:
(a) a bill of sale for the Acquired Assets;
(b) assignments of all Assigned Contracts;
(c) assignments of all Purchased Intellectual Property;
(d) [Intentionally omitted.]
(e) [Intentionally omitted.]
(f) [Intentionally omitted.]
(g) [Intentionally omitted.]
(h) all certificates, powers of attorney, grants, and other documents necessary to cause the release of any Lien encumbering any of the Acquired Assets; and
(i) each of the documents, certificates and other instruments required pursuant to Section 14.01 and all other reasonable documents, instruments, or affidavits which are customary, or which reasonably may be required to effect the Closing hereunder.

9.03. At the Closing the Buyer will deliver to the Seller the cash portion of the Purchase Price described in Section 4, above.

9.04. Any taxes or other expenses due on Assigned Contracts shall be prorated as of 12:01 a.m. on the Closing Date, with all such items attributable to period prior to 12:01 a.m. on the Closing Date being for the sole account of the Seller and all such items attributable to periods after 12:01 a.m. on the Closing Date being for the sole account of the Buyer. If the actual taxes are not available to determine the proration at the Closing Date, the proration shall occur based upon the most recent tax returns available and, if such taxes change when the final tax returns are available, the Parties will re-prorate the taxes and make such payments to each other as are necessary. The Buyer and the Seller shall furnish each other with such documents and other records as shall be reasonably requested in order to confirm all proration calculations. This provision shall survive the Closing.

9.05. Simultaneously with or following the Closing, Buyer may, but is not obligated to, take the following actions in its sole and subjective discretion: Prepare such additional documents, notices and agreements and do such other acts as may be reasonably necessary to fully implement the intent of this Agreement and to perfect and preserve the rights and interests of Buyer under the Assigned Contracts.

## 10. [Intentionally omitted.]

Case 2:18-bk-12041-BKM    Doc 206    Filed 03/15/19    Entered 03/15/19 16:45:21    Desc
Main Document      Page 18 of 40

**11. Representations And Warranties By The Seller.** Except as set forth below, the Sale is an "as is where is" transaction, and the Seller cannot make any representations or warranties to the Buyer. The Seller represents and warrants that the statements contained below in this Section 11 shall be correct and complete as of the Closing Date.

11.01. Subject to the entry of the Final Order approving the assumption and assignment of the Assigned Contracts and the Leases and the payment of any cure costs, if applicable, the Seller has complied with all requirements of the Bankruptcy Rules in connection with obtaining approval of the sale of the Acquired Assets (including the assumption and assignment to Buyer of any Assigned Contracts and Leases, and the assumption of the Assumed Liabilities by the Buyer pursuant to this Agreement).

11.02. The Seller's bankruptcy schedules, as amended, set forth a complete and accurate list of the material Equipment owned by the Seller as of the Petition Date and primarily used or intended to be used in connection with the Business of the Seller.

**12. Pre-Closing Covenants.** The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing:

12.01. Each of the Parties will use commercially reasonable efforts to take all actions and to do all things necessary in order to consummate and make effective the transactions contemplated by this Agreement, including (a) executing such additional transaction documents necessary, in Buyer's reasonable discretion, to consummate the transactions (b) the Seller obtaining such necessary approvals, powers of attorney, or other authority , and (c) satisfying, but not waiver, of the Closing conditions set forth in Section 13 below.

12.02. Seller will use commercially reasonable efforts to obtain the Approval Order from the Bankruptcy Court and any authorizations, consents, and approvals of governments and governmental agencies in connection with the matters required to consummate the transactions contemplated herein.

12.03. Seller will not engage in any practice, take any action, or enter into any transaction outside the Ordinary Course of Business or commit or permit to be committed any waste to the Acquired Assets.

12.04. The Seller will use commercially reasonable efforts to keep the Business substantially intact, including present operations, physical facilities, working conditions, insurance policies, and relationships with lessors, lessees, licensors, suppliers, customers, and employees so as to not commit or permit to be committed any waste to the Acquired Assets.

12.05. Seller will permit representatives of the Buyer (including legal counsel and accountants), on reasonable notice, to have full access at all reasonable times, and in a manner so as not to interfere with the normal business operations of the Seller, to all premises, properties, personnel, books, records, contracts, and documents of or pertaining to the Seller.

12.06. The Seller will give prompt written notice to the Buyer of any fact or event which would result in a breach of any of the representations and warranties in Section 11 above. No disclosure by any Party pursuant to this Section 12.06, however, shall be deemed to amend or supplement the Schedule or to prevent or cure any misrepresentation, breach of warranty.

12.07. The Seller will maintain and preserve the Real Property in substantially the same condition as existed on the date of this Agreement, ordinary wear and tear excepted, and will not demolish or remove any of the existing improvements from, or erect new improvements on, the Real Property, or any portion thereof, without the prior written consent of the Buyer.

12.08. The Seller shall (a) use commercially reasonable efforts to maintain the Permits (it being acknowledged and agreed that no Seller shall be obligated to proceed with any construction or development activities in connection with such efforts to maintain Permits), (b) use commercially reasonable efforts to preserve the goodwill, if any, and business relationships, if any, in connection with the Acquired Assets, (c) perform in all material respects all of its obligations under the Assigned Contracts, except as performance is excused by Bankruptcy Code § 365(e), (d) cooperate with Buyer in connection with Buyer's efforts to seek the assignment to Buyer or its designee of any claims under any insurance policies that described in Paragraph 5.13, (e) comply with all Applicable Laws in all material respects, and (f) maintain its Records.

12.09. Between the date of this Agreement and the Closing Date, except with the written consent or approval of the Buyer:
(a) Seller shall not sell, lease, transfer or assign any of its assets, tangible or intangible, other than in the Ordinary Course of Business;
(b) Seller shall not enter into any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) outside the Ordinary Course of Business;
(c) Seller shall not amend, modify, extend, renew, accelerate, cancel or terminate any agreement, contract, lease, or license (or series of related agreements, contracts, leases, and licenses) involving more than $1,000 to which any Seller is a party or by which any Seller is bound outside of the Ordinary Course of Business, except as mentioned below in Section 12.10;
(d) Seller shall not amend, modify, restate, terminate, or otherwise alter in any manner whatsoever, any document or agreement directly or indirectly other than in the Ordinary Course of Business;
(e) No action taken by Seller or by any party in connection with the Bankruptcy Case may, in Buyer's reasonable judgment, have the effect of materially diminishing the value any of the Acquired Assets;
(f) No act or event caused by Seller, or caused by any party in connection with the Bankruptcy Case, in Buyer's reasonable judgment, in any way materially impairs or restricts Buyer's ability to utilize the Acquired Assets as contemplated by this Agreement;
(g) Seller shall not incur, create or assume any Indebtedness, other than Indebtedness in an aggregate principal amount not in excess of $1,000; provided, however that this provision shall not preclude the incurring of Indebtedness that is both (i) incurred in the Ordinary Course of Business or administrative claims in the Bankruptcy Case, and (ii) not an Assumed Liability;
(h) Seller shall not impose any Liens upon any of the Acquired Assets, which will remain outstanding after the Closing Date other than Permitted Encumbrances;
(i) Seller shall not cancel, compromise, waive, or release any cause of action owned by Seller that is an Acquired Asset outside the Ordinary Course of Business; provided, however, this does not

limit any Seller's right to compromise Claims against the Seller or cancel, compromise, waive or release any cause of action or right that is an Excluded Asset;

(j) Seller will not declare, set aside, or pay any dividend or make any distribution with respect to its capital stock (whether in cash or in kind) or redeem, purchase, or otherwise acquire any of its capital stock;

(k) Seller will not make any loan to, or enter into any other transaction with, any of its directors, officers, and employees that would create an obligation of the Buyer after the Closing Date;

(l) Seller will not enter into any employment contract or collective bargaining agreement, written or oral, or modify the terms of any existing such contract or agreement that would create an obligation of the Buyer after the Closing Date;

(m) Seller will not grant any increase in the base compensation of any of its directors, officers, and employees that would create an obligation of the Buyer after the Closing Date;

(n) Seller will not adopt, amend, modify, or terminate any bonus, profit sharing, incentive, severance, or other plan, contract, or commitment for the benefit of any of its directors, officers, and employees (or take any such action with respect to any other Employee Benefit Plan) that would create an obligation of the Buyer after the Closing Date;

(o) Seller will not make any other change in employment terms for any of its directors, officers, and employees that would create an obligation of the Buyer after the Closing Date; and

(p) Seller shall not make or pledge to make any charitable or other capital contribution.

12.10. The Seller shall use commercially reasonable efforts and cooperate with the Buyer to assist the Buyer with negotiations to amend the FCA Agreements and the Sun Valley Lease prior to Closing, pursuant to terms and conditions that will be negotiated by the Buyer.

**13. Post-Closing Covenants.** The Parties agree as follows with respect to the period following the Closing:

13.01. If at any time after the Closing any further actions are necessary to carry out the purposes of this Agreement, each of the Parties will make commercially reasonable efforts to take such further actions (including the execution and delivery of such further instruments and documents) as any other Party may reasonably request, all at the sole cost and expense of the requesting Party. All the Records shall be transferred to the Buyer on or within three (3) business days following the Closing. The Excluded Documents shall be retained by the Seller, which shall retain all relevant privileges relating to the subject matter of the Excluded Documents. After the Parties have taken all steps necessary or appropriate to protect all privileges, the Seller shall provide the Buyer's legal counsel reasonable access to and, at the Buyer's reasonable request, or reasonable notice, to provide copies to the Buyer of any of the Excluded Documents for its review if (i) an actual Claim or liability has been threatened or asserted against the Buyer with respect to the Business as to which the Excluded Documents may be relevant and material. After the Closing the Buyer shall provide to the Seller reasonable access on reasonable notice and the right to make copies at the Seller's expense of any of the Records. The Buyer, shall maintain such Records and provide the access described above for a period which is the longer of (i) five (5) years, (ii) the pendency of any Claim, and (iii) the pendency of any tax audit or investigation by any governmental authority commenced during the first five (5) years after the Closing.

Case 2:18-bk-12041-BKM    Doc 206    Filed 03/15/19    Entered 03/15/19 16:45:21    Desc
Main Document        Page 21 of 40

13.02. In addition to the rights of the Parties with respect to Records set forth in Section 13.01, above, in the event and for so long as any Party actively is contesting or defending against any action, suit, proceeding, hearing, investigation, charge, complaint, Claim, or demand in connection with (i) any transaction contemplated under this Agreement, or (ii) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction on or prior to the Closing Date involving the Seller relating to any of the museum cars or other Acquired Assets or Assumed Liabilities, each of the Parties will cooperate with the Party involved therein and its counsel in the contest or defense, make available its personnel, and provide such testimony and access to its books and records as shall be necessary in connection with the contest or defense, all at the sole cost and expense of the contesting or defending Party.

13.03. As soon as practicable after Closing but in all cases within 90 days after Closing, Buyer shall prepare a schedule (the "Allocation Schedule") allocating the Purchase Price (including, for purposes of this Section, any other consideration paid by Buyer) among the Acquired Assets and shall provide a copy of the Allocation Schedule to the Seller. Seller and Buyer each agree to file Internal Revenue Service Form 8594 and any required attachments thereto, together with all Tax Returns, in accordance with the Allocation Schedule and agree not to take any position before any taxing authority or in any judicial proceeding that is in any way inconsistent with such allocation. Seller agrees to promptly provide Buyer with any other information required to complete the Allocation Schedule.

13.04. The Parties agree that they shall not make any disparaging remarks about any other Party or its Affiliates to any third party including to financing entities, trade vendors, employees, shareholders, or journalists.

13.05. It is the parties' intent to work together in good faith to fulfill their respective obligations under this Agreement and not to default in those obligations. Each party specifically acknowledges and agrees that it shall cooperate with the other party to effectuate the purposes of this Agreement.

13.06. To the extent certain Acquired Assets and Assumed Liabilities require further documentation to be signed and filed in order to duly transfer such Acquired Assets and Assumed Liabilities and Buyer is unable to locate and obtain the Seller's cooperation to do so after expending reasonable efforts, the Seller grants the Buyer the power of attorney to sign and file such documentation on the Seller's behalf.

**14. Conditions To Obligation To Close.**

14.01. The Buyer's obligation to consummate the transactions to be performed by it in connection with the Closing is subject to satisfaction of the following conditions:
(a) [Intentionally omitted.];
(b) the Seller has performed and complied with all of their covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by the term "material," in which case the Seller shall have performed and complied with all of such covenants (as so written, including the term "material") in all respects through the Closing;
(c) [Intentionally omitted.];

(d) the Approval Order has become a Final Order;

(e) other than with respect to the Approval Order, no action, suit, or proceeding shall be pending or threatened before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent consummation of any of the transactions contemplated by this Agreement, or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation;

(f) the Seller shall have received any authorizations, consents, and approvals of Government Agencies, necessary for the transactions reflected in this Agreement;

(g) [Intentionally omitted.]

(h) the Buyer shall have received copies of the certificate of good standing of the Seller issued on or soon before the Closing Date by the Secretary of State (or comparable officer) of the jurisdiction of each such Person's organization;

(i) [Intentionally omitted.]

(j) [Intentionally omitted.]

(k) Seller shall certify in writing that all receivables (i) arose from bona fide transactions in the ordinary course of business and are payable on ordinary trade terms; (ii) are legal, valid and binding obligations of the Seller enforceable in accordance with their terms; (iii) are not subject to any set-off, counterclaim or other defense; (iv) are collectible in the ordinary course of business of Seller, consistent with past practice, in the aggregate recorded amounts thereof; (v) are not the subject of any proceedings brought by or on behalf of Seller or a collection by a third party on behalf of the Seller; and (vi) do not represent obligations which are conditional on an occurrence or event, or the absence of an occurrence or event.

(l) the execution of the definitive agreements set forth on Schedule 14.01(l) hereto, and the fulfillment or waiver of all conditions to closing thereunder;

(m) [Intentionally omitted.]

(n) [Intentionally omitted.]

(o) [Intentionally omitted.]

(p) to the extent the Seller has any ownership interest or right to access in the database of attendee or other student or other information they shall be transferred to the Buyer in a form acceptable to the Buyer at the Closing.

The Buyer may waive any condition specified in this Section 14.01 only if it executes a writing so stating at or prior to the Closing.

14.02. The obligation of the Seller to consummate the transactions to be performed by the Seller in connection with the Closing is subject to satisfaction of the following conditions:

(a) [Intentionally omitted.]

(b) the Buyer shall have performed and complied with all of its covenants hereunder in all material respects through the Closing, except to the extent that such covenants are qualified by the term "material," in which case the Buyer shall have performed and complied with all of such covenants (as so written, including the term "material") in all respects through the Closing;

(c) the Approval Order has become a Final Order;

(d) No action, suit, or proceeding shall be pending before any court or quasi-judicial or administrative agency of any federal, state, local, or foreign jurisdiction or before any arbitrator wherein an unfavorable injunction, judgment, order, decree, ruling, or charge would (A) prevent

consummation of any of the transactions contemplated by this Agreement or (B) cause any of the transactions contemplated by this Agreement to be rescinded following consummation (and no such injunction, judgment, order, decree, ruling, or charge shall be in effect);

(e) the Seller shall have received any authorizations, consents, and approvals of Government Agencies, excluding BIA approval related to the Sun Valley Lease (as defined in Disclosure Schedule 3.47), necessary for the transactions reflected in this Agreement;

The Seller may waive any condition specified in this Section 14.02 if it executes a writing so stating at or prior to the Closing.

## 15. Termination.

15.01. The Parties may terminate this Agreement as provided below:

(a) The Buyer and the Seller may terminate this Agreement by mutual written consent at any time prior to the Closing;

(b) The Buyer may terminate this Agreement by giving written notice to the Seller at any time prior to the Closing if (A) the Seller has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, the Buyer has notified the Seller of the breach, and the breach has continued without cure for a period of 5 days after the notice of breach, (B) the Bankruptcy Court does not approve this Agreement and the Bid Procedures, which shall include the Termination Fee and reimbursement of expenses as set forth herein, or (C) the Closing shall not have occurred on or before the Closing Date, unless otherwise agreed in the writing by the Parties; and (c) The Seller may terminate this Agreement by giving written notice to the Buyer at any time prior to the Closing if (A) the Buyer has breached any material representation, warranty, or covenant contained in this Agreement in any material respect, the Seller has notified the Buyer of the breach, and the breach has continued without cure for a period of 5 days after the notice of breach, (B) the Bankruptcy Court does not approve this Agreement and the Bid Procedures, which shall include the Termination Fee and reimbursement of expenses as set forth herein, or (C) the Bankruptcy Court approves and the Seller consummates an alternative sale to a Qualified Bidder that is not the Buyer, and the Seller pays the Buyer the Termination Fee and reimburses expenses as set forth above in Section 8, unless otherwise ordered by the Bankruptcy Court, or (D) the Closing shall not have occurred on or before the Closing Date, unless otherwise agreed in writing by the Parties.

## 16. [Intentionally omitted.]

## 17. Miscellaneous.

17.01. [Intentionally omitted.]

17.02. This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns. Anywhere in this Agreement that provides for a release of a Lien and the imposition of a replacement Lien on proceeds, the Lien that attaches shall have no greater rights or priorities than the Liens being released and shall be subject to all defenses and counter-claims to which the existing Liens are subject.

17.03. This Agreement (including all documents referred to herein and all Exhibits and Schedules hereto) constitute the entire agreement among the Parties and supersede all prior understandings, agreements, or representations by or among the Parties, written or oral, to the extent they relate in any way to the subject matter hereof.

17.04. This Agreement shall be binding upon and inure to the benefit of the Parties named herein and their respective successors and permitted assigns. No Party may assign either this Agreement or any of his, her, or its rights, interests, or obligations hereunder without the prior written approval of the Buyer and the Seller; provided, however, that the Buyer may (i) assign any or all of its rights and interests hereunder to a Subsidiary, and (ii) designate that assignee to perform its obligations hereunder (in any or all of which cases the Buyer nonetheless shall remain responsible for the performance of all of its obligations hereunder) and if the Buyer makes such an assignment, the term "the Buyer" shall be deemed to refer to that assignee on and after the date of that assignment, including for the avoidance of doubt, for the purposes of the representations, covenants and warranties contained in Section 10.

17.05. This Agreement may be executed in one or more counterparts (including by means of facsimile or PDF), each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

17.06. The section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

17.07. All notices, requests, demands, Claims, and other communications hereunder shall be in writing. Any notice, request, demand, Claim, or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) 1 business day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) 1 business day after being sent to the recipient by facsimile transmission or electronic mail, or (iv) 3 business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

Any Party may change the address to which notices, requests, demands, Claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

17.08. This Agreement shall be governed by and construed in accordance with the domestic laws of the State of Arizona applicable to a contract executed and performed exclusively in the State of Arizona.

17.09. No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by the Parties. No waiver by any Party of any provision of this Agreement or any default, misrepresentation, or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation, or breach of warranty or covenant hereunder or affect in any way any rights

arising by virtue of any prior or subsequent such default, misrepresentation, or breach of warranty or covenant.

17.10. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

17.11. The Buyer and the Seller shall bear their own costs and expenses (including legal fees and expenses) incurred in connection with this Agreement and the transactions contemplated hereby, except if Bankruptcy Court approves and the Seller consummates an alternative sale to a Qualified Bidder that is not the Buyer, then the Seller pays the Buyer the Termination Fee and reimburses expenses as set forth above in Section 8.

17.12. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. The Parties intend that each representation, warranty, and covenant contained herein shall have independent significance. If any Party has breached any representation, warranty, or covenant contained herein in any respect, the fact that there exists another representation, warranty, or covenant relating to the same subject matter (regardless of the relative levels of specificity) that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, or covenant.

17.13. The Exhibits and Disclosure Schedules identified in this Agreement are incorporated herein by reference and made a part hereof.

17.14. The Bankruptcy Court shall have exclusive jurisdiction over any dispute between the Buyer and the Seller relating to this Agreement, the transaction contemplated herein, the Acquired Assets or the Assumed Liabilities.

[signature blocks on next pages]

**AZNY22, LLC, an Arizona limited liability company**

Jacob Reuben
Its: Manager

**Bob Bondurant School of High Performance Driving, Inc.**

By: _____
    Timothy H. Shaffer
    Its: Chief Restructuring Officer

3-15-2019

Schedules:

3.06 – Assigned Contracts
3.27 – Current contracts
3.47 – Leased Real Property
3.69 – Purchased Intellectual Property
4.02(a) – Excluded Contracts
5.08 – Physical Assets
9.02(g) – Individual NDA/NCA/NSA
14.01(l) – Definitive Agreements to be Signed Prior to Closing

Case 2:18-bk-12041-BKM    Doc 206    Filed 03/15/19    Entered 03/15/19 16:45:21    Desc
Main Document        Page 29 of 40

Schedule 3.06 – Contracts to be assumed and assigned, with consent as necessary

1.  Sublease BL, dated August 1, 2016, by and between Sun Valley Marina Development Corporation, and Bob Bondurant School of High Performance Driving, Inc., as amended ("Sun Valley Lease").

2.  Lease Agreement, between Bob Bondurant School of High Performance Driving, Inc. and UniFiEquipment Finance, Inc., with Agreement No: 195970-001, dated March 13, 2018, for the Nitehawk Osprey II – installed on 2017 GMC 2500.

3.  Lease Agreement, between Bob Bondurant School of High Performance Driving, Inc. and UniFiEquipment Finance, Inc., with Agreement No: 195970-002, dated July 25, 2018, for Hunter TCR1X Fully Automatic Tire Changer.

Schedule 3.27 – Current Contracts

1. Master Lease Agreement Open-End Lease, by and between The Bancorp Bank and Bob Bondurant School of High Performance Driving, Inc., Robert Bondurant, individually, and Pat Bondurant, individually, dated July 23, 2015, and all rental schedules subsequently added thereto.

2. Finance Lease Agreement – Equipment, by and between The Bancorp Bank and Bob Bondurant School of High Performance Driving, Inc., Robert Bondurant, individually, and Pat Bondurant, individually, dated April 26,2016, and all rental schedules subsequently added thereto.

3. Promissory Note, dated July 28, 2011, issued by Bob Bondurant School of High Performance Driving, Inc. (as Borrower) to JPMorgan Chase Bank, NA (as Lender), evidencing a Business Line of Credit, secured by a blanket lien against Borrower's assets pursuant to a grant of security within the promissory note and a filed UCC-1 financing statement, and guaranteed by Robert L. Bondurant pursuant to a Continuing Unlimited Guaranty.

4. Lease Agreement between Bob Bondurant School of High Performance Driving, Inc. and Wells Fargo Financial Leasing, Inc., dated on or around July 28, 2017, for Kyocera 5052ci SN W2H6Z02565 and Kyocera 2552ci SN VFJ7300695.

5. Lease Agreement No. 7990834-001, between Bob Bondurant School of High Performance Driving, Inc. and Wells Fargo Vendor Financial Services, LLC, dated on or around May 2, 2016, for phone system, routers and switch.

6. Sublease BL, dated August 1, 2016, by and between Sun Valley Marina Development Corporation, and Bob Bondurant School of High Performance Driving, Inc., as amended ("Sun Valley Lease").

7. Lease Agreement, between Bob Bondurant School of High Performance Driving, Inc. and UniFiEquipment Finance, Inc., with Agreement No: 195970-001, dated March 13, 2018, for the Nitehawk Osprey II – installed on 2017 GMC 2500.

8. Lease Agreement, between Bob Bondurant School of High Performance Driving, Inc. and UniFiEquipment Finance, Inc., with Agreement No: 195970-002, dated July 25, 2018, for Hunter TCR1X Fully Automatic Tire Changer.

9. Fiat/Bondurant Agreement, dated August 21, 2016, between Bob Bondurant School of High Performance Driving, Inc. and FCA US LLC, as amended (the "Fiat Agreement") [expired].

10. Promotional Agreement, dated October 6, 2015, between Bob Bondurant School of High Performance Driving, Inc. and FCA US LLC, as amended (the "Dodge Agreement", and together with the Fiat Agreement, the "FCA Agreements").

11. Services Agreement between Bob Bondurant School of High Performance Driving, Inc. and Meltwater News US Inc., pursuant to the terms and conditions set forth in that certain Order Confirmation, dated on or around November 28, 2017.

Schedule 3.47 – Leased Real Property

1.  Sublease BL, dated August 1, 2016, by and between Sun Valley Marina Development Corporation, and Bob Bondurant School of High Performance Driving, Inc., as amended ("Sun Valley Lease").

Schedule 3.69 – Purchased Intellectual Property

Trademarks:

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **Bob Bondurant School of High Performance Driving, Inc.** | | | | | | | | |
| **1 (Steering Wheel Logo)** | US | 6/3/2003 | 78257603 | TM Principal Registered | 2893308 | 10/12/2004 | | 10/12/2024 |
| *Recorded Owner:* | | Class(es): 18 Goods/Services: travel bags and backpacks | | | | | | |
| **1 (Steering Wheel Logo)** | US | 4/29/2003 | 78243182 | TM Principal Registered | 2940794 | 4/12/2005 | | 4/12/2025 |
| *Recorded Owner:* | | Class(es): 25 Goods/Services: Clothing, namely shirts, hats, jackets and racing suits; and onesies for children. | | | | | | |

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **1 (Steering Wheel Logo)** | US | 10/3/1996 | 75176633 | TM Principal Registered | 2144186 | 3/17/1998 | | 3/17/2028 |
| *Recorded Owner:* | | Class(es): 41 Goods/Services: education services, namely, conducting classes and workshops in the field of high performance driving, grand prix road racing, advanced road racing, highway driving safety and survival, and executive protection driving | | | | | | |
| **BOB'S SIGNATURE (DESIGN/STYLIZED)** | US | 3/27/2007 | 77141908 | TM Principal Registered | 3375193 | 1/29/2008 | | 1/29/2028 |
| *Recorded Owner:* | | Class(es): 25 Goods/Services: Clothing, namely, hats and shirts | | | | | | |
| **BOB'S SIGNATURE (DESIGN/STYLIZED)** | US | 3/27/2007 | 77141941 | TM Principal Registered | 3377443 | 2/5/2008 | | 2/5/2028 |
| *Recorded Owner:* | | Class(es): 41 Goods/Services: Vehicle driving instruction. | | | | | | |

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT** | US | 10/7/1997 | 75369304 | TM Principal Registered | 2260463 | 7/13/1999 | | 7/13/2019 |

Class(es): 12
Goods/Services: Motor vehicles, Namely, Automobiles

*Recorded Owner:*

---

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT** | US | 6/3/2003 | 78257583 | TM Principal Registered | 3014846 | 11/15/2005 | | 11/15/2025 |

Class(es): 18
Goods/Services: travel bags and backpacks

*Recorded Owner:*

---

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT** | US | 4/29/2003 | 78243166 | TM Principal Registered | 2917222 | 1/11/2005 | | 1/11/2025 |

Class(es): 25
Goods/Services: Clothing, namely shirts, hats, jackets, and racing suits; and bodysuits for children.

*Recorded Owner:*

---

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT** | US | 10/3/1996 | 75176583 | TM Principal Registered | 2147223 | 3/31/1998 | | 3/31/2028 |

Class(es): 41
Goods/Services: education services, namely, conducting classes and workshops in the field of high performance driving, grand prix road racing, advanced road racing, highway driving safety and survival, and executive protection driving.

*Recorded Owner:*

---

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT** | China | | 11587446 | TM Foreign Registered | 11587446 | | | 3/13/2024 |

Class(es): 41
Goods/Services:

*Recorded Owner:*

---

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **Bondurant Performance Driving** | US | 4/26/2012 | 85609687 | TM Principal Registered | 4286919 | 2/5/2013 | | 2/5/2019 |

Class(es): 41
Goods/Services:

*Recorded Owner:*

---

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT SUPERKART** | US | 4/3/1998 | 75461297 | TM Principal Registered | 2534420 | 1/29/2002 | | 1/29/2022 |

Class(es): 41
Goods/Services: Entertainment services in the nature of staging racing events

*Recorded Owner:*

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **BONDURANT SUPERKART** | US | 5/24/2000 | 76055518 | TM Principal Registered | 2619601 | 9/17/2002 | | 9/17/2022 |

Class(es): 41
Goods/Services: Motor vehicle driving instruction

*Recorded Owner:*

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **Steering Wheel Logo** | China | | 11587443 | TM Foreign Registered | 11587443 | | | 3/27/2024 |

Class(es): 41
Goods/Services:

*Recorded Owner:*

| | Country | Filing Date | Application No. | Trademark Status | Reg. No. | Reg. Date | First Use Date | Use/Renewal Deadline |
|---|---|---|---|---|---|---|---|---|
| **THE BONDURANT METHOD** | US | 8/7/2000 | 76105317 | TM Principal Registered | 2910236 | 1/18/2005 | | 1/18/2025 |

Class(es): 41
Goods/Services: Motor vehicle driving instruction

*Recorded Owner:*

Internet domain name/websites:

Bondurant.com

Schedule 4.02(a) – Excluded Contracts

1. Master Lease Agreement Open-End Lease, by and between The Bancorp Bank and Bob Bondurant School of High Performance Driving, Inc., Robert Bondurant, individually, and Pat Bondurant, individually, dated July 23, 2015, and all rental schedules subsequently added thereto ("Bancorp Agreement 1").

2. Finance Lease Agreement – Equipment, by and between The Bancorp Bank and Bob Bondurant School of High Performance Driving, Inc., Robert Bondurant, individually, and Pat Bondurant, individually, dated April 26,2016, and all rental schedules subsequently added thereto ("Bancorp Agreement 2", and together with Bancorp Agreement 1, the "Bancorp Agreements").

3. Promissory Note, dated July 28, 2011, issued by Bob Bondurant School of High Performance Driving, Inc. (as Borrower) to JPMorgan Chase Bank, NA (as Lender), evidencing a Business Line of Credit, secured by a blanket lien against Borrower's assets pursuant to a grant of security within the promissory note and a filed UCC-1 financing statement, and guaranteed by Robert L. Bondurant pursuant to a Continuing Unlimited Guaranty.

4. Lease Agreement between Bob Bondurant School of High Performance Driving, Inc. and Wells Fargo Financial Leasing, Inc., dated on or around July 28, 2017, for Kyocera 5052ci SN W2H6Z02565 and Kyocera 2552ci SN VFJ7300695 ("Wells Fargo Agreement 1").

5. Lease Agreement No. 7990834-001, between Bob Bondurant School of High Performance Driving, Inc. and Wells Fargo Vendor Financial Services, LLC, dated on or around May 2, 2016, for phone system, routers and switch ("Wells Fargo Agreement 2", and together with Wells Fargo Agreement 1, the "Wells Fargo Agreements").

12. Services Agreement between Bob Bondurant School of High Performance Driving, Inc. and Meltwater News US Inc., pursuant to the terms and conditions set forth in that certain Order Confirmation, dated on or around November 28, 2017.

Schedule 5.08 – Physical Assets

None.

Schedule 9.02(g) – Individual NDA/NCA/NSA

Michael McGovern
Daniel Bullock
Garrison Blue
Katharine Jean Poltash
William Hawkins
Robert Knipe
William Parker
Austin Robinson
Tyler Tibbits
Sarah Michael
Ramon Soberanes
Daiquain Ortiz
Tyler Gervin
Steve Pfeiffer
James Anderson
Jordan Fear
Christine Flores
Stevie Pearrie
Randy Phillips

Case 2:18-bk-12041-BKM    Doc 206    Filed 03/15/19    Entered 03/15/19 16:45:21    Desc
Main Document       Page 39 of 40

Schedule 14.01(l) – Definitive Agreements to be Signed Prior to Closing

1. Amended FCA Agreements, pursuant to terms and conditions to be negotiated between the Buyer and FCA USA LLC.

2. Amended Sun Valley Lease, pursuant to terms and conditions to be negotiated between the Buyer and Sun Valley Marina Development Corporation.

3. Non-Disclosure, Non-Compete, and Non-Solicit Agreements between the Buyer and each of the individuals identified on Disclosure Schedule 9.02(g) in a form acceptable to Buyer.

4. Assignments of all Assigned Contracts in a form acceptable to Buyer;

5. Assignments of all Purchased Intellectual Property in a form acceptable to Buyer;